# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DAVID LEE BRADSHAW**,

      Plaintiff,

v.                                        Case No.  1:22-CV-00139

**MANAGEMENT AND TRAINING CORPORATION**,
a foreign corporation doing business in New Mexico,
**RICARDO MARTINEZ**, as Warden of
the Otero County Prison Facility,
**JOHN DOES 1-5**, as employees or agents
of Management and Training Corporation,
**OTERO COUNTY BOARD OF COUNTY
COMMISSIONERS**,
**DAVID BLACK**, as Otero County Sheriff,
**JOHN DOES 6-10** as public employees of Otero County,
**NEW MEXICO CORRECTIONS DEPARTMENT**,
**ALISHA TAFOYA LUCERO**, as Secretary
of the New Mexico Corrections Department,
**JOHN DOE 11-15**, as public employees of the
New Mexico Corrections Department,

      Defendants.                         <u>**Jury Trial Requested**</u>

## <u>COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, NEGLIGENCE, AND OTHER TORTIOUS CONDUCT</u>

COMES NOW Plaintiff David Lee Bradshaw, through his undersigned counsel, Carolyn M. "Cammie" Nichols and Arne R. Leonard of Rothstein Donatelli LLP, Linda G. Hemphill and Leigh Messerer of The Hemphill Firm PC, and William H. Snowden of The Snowden Law Firm, PC, and brings the following causes of action under 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, the New Mexico Tort Claims Act ("NMTCA"), other New Mexico statutes, and the common law. Mr. Bradshaw seeks an award of damages as provided by law from each of the above-named Defendants for their wrongful acts and omissions and the permanent damages he sustained as a result thereof while in their custody as an inmate of the New Mexico Corrections Department.

## TABLE OF CONTENTS[1]

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

JURISDICTION, VENUE, AND NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

FACTUAL BASIS FOR THIS LAWSUIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A.      Mr. Bradshaw's career as a law enforcement officer and prosecution witness. . . . . 10

        1.      Mr. Bradshaw's role as a prosecution witness in two murder-for-hire
                cases in Dona Ana County. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.      The events leading to Mr. Bradshaw's criminal conviction for conduct
                that did not violate clearly established law. . . . . . . . . . . . . . . . . . . . . . . . . . 12

B.      Mr. Bradshaw's wrongful incarceration at OCPF. . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.      Mr. Bradshaw's intake screening and classification. . . . . . . . . . . . . . . . . . . 14

        2.      Mr. Bradshaw's placement in Unit S2 at OCPF. . . . . . . . . . . . . . . . . . . . . . . 16

        3.      The extortion and threats directed against Mr. Bradshaw at OCPF. . . . . . . 18

        4.      Mr. Bradshaw's efforts to extricate himself from the extortion racket
                and report threatening and unlawful activity at OCPF. . . . . . . . . . . . . . . . . 27

        5.      The violent attack on Mr. Bradshaw while housed at OCPF. . . . . . . . . . . . . 29

        6.      Neglect of Mr. Bradshaw's serious medical needs while housed at OCPF. . . 33

        7.      The inadequate response and attempt to cover up the violent attack
                on Mr. Bradshaw. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

C.      Mr. Bradshaw's continued incarceration at CNMCF and other facilities. . . . . . . . 37

---

[1] The Table of Contents and section headings in this pleading are provided as a "road map" and "mile markers" to assist the reader in navigating the document. Each section heading is also bookmarked, and the bookmarks can be accessed by clicking the bookmark icon in the left margin of the Adobe Acrobat reader. Neither the Table of Contents nor the section headings nor the bookmarks in this pleading are intended to constitute enumerated paragraphs to which an admission or denial is expected in a responsive pleading pursuant to Fed. R. Civ. P. 8(b). Accordingly, Mr. Bradshaw will not move to deem admitted any statement contained in the Table of Contents, section headings, or bookmarks based on a failure to deny it, as a responsive pleading to those statements is not required.

1.    Neglect of Mr. Bradshaw's serious medical needs upon his transfer to CNMCF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

2.    Mr. Bradshaw's first transfer to and from the Dona Ana County detention facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

3.    Mr. Bradshaw's disciplinary hearing at CNMCF. . . . . . . . . . . . . . . . . . . . . . 40

4.    Delays in getting Mr. Bradshaw to off-site appointments with specialists for necessary follow-up care for his serious medical needs. . . . . . 41

5.    Mr. Bradshaw's efforts to prevent his return to OCPF during the height of the COVID-19 outbreak at that facility. . . . . . . . . . . . . . . . . . . . . . 43

6.    Mr. Bradshaw's second transfer to and from the Dona Ana County detention facility during the COVID-19 pandemic. . . . . . . . . . . . . . . . . . . . . 46

7.    Continued neglect of Mr. Bradshaw's serious medical needs for the remainder of his incarceration at CNMCF and delays in his parole. . . . . . . . 47

D.    Other unlawful activities at OCPF evincing policies, customs, and practices that cause constitutional violations at the facility to occur and recur. . . . . . . . . . . . 50

1.    Defendant MTC's Failure to Train and Supervise Staff at OCPF. . . . . . . . . 50

2.    Federal Prosecution of Drug Trafficking Conspiracies at OCPF. . . . . . . . . . 51

3.    Defendant MTC's Labor Law Violations at OCPF. . . . . . . . . . . . . . . . . . . . 51

4.    Violation of New Mexico Open Records Laws at OCPF. . . . . . . . . . . . . . . . 52

E.    Longstanding corporate policies, practices, and customs of Defendant MTC that cause constitutional violations to occur and recur. . . . . . . . . . . . . . . . . . . 56

1.    The 2003 DOJ Report on Santa Fe County's Adult Detention Center. . . . . . 56

2.    Defendant MTC's Mistreatment of Immigrants and Foreign Detainees. . . . 58

3.    Unlawful activities at MTC-run detention facilities in Texas. . . . . . . . . . . . 60

4.    Defendant MTC's custom and practice of ceding control of Arizona prison facilities to prison gang members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

5.    Defendant MTC's involvement in "Operation Mississippi Hustle." . . . . . . . 66

F.    Policies, practices, and customs of Otero County that evince neglect, mismanagement, and abdication of statutory duties. . . . . . . . . . . . . . . . . . . . . . . . . 69

1.      Otero County's contracting practices at OCPF and OCPC. . . . . . . . . . . . . . 69

2.      Otero County's notice of MTC's illegal activities and mismanagement. . . . . 71

3.      Otero County's failure to investigate unlawful activity at its own facilities. . 74

4.      Otero County's violation of open records laws. . . . . . . . . . . . . . . . . . . . . . . . 76

G.     Policies, practices, and customs of Defendant NMCD which evince
       its neglect, mismanagement, and dereliction of its statutory duties
       with respect to inmates in state custody. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

       1.      Defendant NMCD's notice of unlawful policies, practices,
               and customs of Defendants MTC and Otero County. . . . . . . . . . . . . . . . . 77

       2.      Defendant NMCD's use of faulty inmate classification systems. . . . . . . . . . 78

       3.      Defendant NMCD's use of substandard private prison contractors. . . . . . . 81

       4.      Defendant NMCD's neglect and mismanagement of contracts
               for private, for-profit commissaries at prison facilities. . . . . . . . . . . . . . . . 85

       5.      Defendant NMCD's violations of open records laws
               and discovery orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

COUNT I: MR. BRADSHAW'S FEDERAL CIVIL RIGHTS CLAIMS
AGAINST DEFENDANTS MTC, WARDEN MARTINEZ, AND JOHN DOES 1-5 . . . . . 90

COUNT II: MR. BRADSHAW'S STATE LAW CLAIMS AGAINST
DEFENDANTS MTC, WARDEN MARTINEZ, AND JOHN DOES 1-5 . . . . . . . . . . . . . . 94

A.     The MTC Defendants' negligence under common-law tort principles. . . . . . . . . . . . 95

B.     The MTC Defendants' professional negligence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

C.     The MTC Defendants' negligence *per se*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

COUNT III: MR. BRADSHAW'S STATE LAW CLAIMS AGAINST
DEFENDANTS OTERO COUNTY, SHERIFF BLACK, AND JOHN DOES 6-10 . . . . . . 102

A.     The Otero County Defendants' negligent operation and maintenance
       of buildings, machinery, equipment, and furnishings. . . . . . . . . . . . . . . . . . . . . . . . 102

B.     The Otero County Defendants' negligent operation of infirmaries,
       health care clinics, or like facilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

**C.**     **Neglect and dereliction of statutory duties by Defendants Black and John Does 6-10.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **106**

**COUNT IV: MR. BRADSHAW'S STATE LAW CLAIMS AGAINST DEFENDANTS NMCD, LUCERO, AND JOHN DOES 11-15** . . . . . . . . . . . . . . . . . . . . . . **109**

**A.**     **The NMCD Defendants' negligent operation of infirmaries, health care clinics, or like facilities.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **109**

**B.**     **The NMCD Defendants' negligent operation and maintenance of buildings, machinery, equipment, and furnishings.** . . . . . . . . . . . . . . . . . . . . . . . **111**

**C.**     **Neglect and abdication of statutory duties by NMCD law enforcement officers.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **113**

**PRAYER FOR RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **115**

**JURY DEMAND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **116**

## PARTIES

1.      Plaintiff David Lee Bradshaw is a former law enforcement officer and former corrections officer who later became an inmate of the New Mexico Corrections Department and was housed in Otero, Dona Ana, and Valencia counties in New Mexico. He suffered serious injuries, including multiple fractures to his jaw, as a result of being violently attacked by another inmate while housed at the Otero County Prison Facility in Otero County, New Mexico, on or about March 1, 2020. Mr. Bradshaw currently resides in New Mexico and is no longer an inmate.

2.      At all material times, Defendant Management and Training Corporation (MTC) was a privately-held, for-profit Delaware corporation registered to do business in New Mexico, with its principal place of business in New Mexico at the Otero County Prison Facility (OCPF), 10 McGregor Range Road, Chaparral, NM 88081. Defendant MTC operated and maintained OCPF as a privately-run state prison facility under color of state law pursuant to a contract with Defendant Otero County Board of County Commissioners, which in turn contracted with Defendant New Mexico Corrections Department to house inmates in state custody. MTC operated

5

and managed numerous other privately-run prison and detention facilities throughout the United States, including the neighboring Otero County Processing Center (OCPC) in Otero County, New Mexico, which housed individuals detained under federal immigration laws by United States Immigration and Customs Enforcement (ICE).

3.      At all material times, Defendant MTC acted through its owners, officers, managers, employees, agents, or apparent agents, including but not limited to wardens, deputy wardens, corrections officers, classification officers, caseworkers, and other staff. Defendant MTC is liable for their acts and omissions under the doctrines of *respondeat superior*, agency, apparent agency, and the statutory duties set forth in NMSA 1978, Section 33-1-17(D), which require prison contractors to assume all liability caused by or arising out of all aspects of the provision or operation of the facility, and to provide for liability insurance or other proof of financial responsibility acceptable to the New Mexico General Services Department covering the contractor and its officers, employees and agents in an amount sufficient to cover all liability caused by or arising out of all aspects of the provision or operation of the facility.

4.      At all material times, Defendant Ricardo Martinez was a resident of Otero County, New Mexico who was employed by Defendant MTC on a full-time salaried basis as the Warden of OCPF in Otero County, New Mexico. Defendant Martinez was acting under color of state law and transacting business in New Mexico within the scope of his employment by MTC as Warden of OCPF. His duties as Warden included securing OCPF, protecting the health, safety, and welfare of individuals held in custody there, including Plaintiff David Lee Bradshaw, and exercising the powers of a peace officer with respect to arrests and enforcement of laws when on the premises at OCPF under NMSA 1978, Sections 33-1-17(E), 33-1-10, and 29-1-1. Additionally, Defendant Martinez was invested with policy-making authority as well as direct supervisory control over John Does 1-5, other MTC employees, and inmates in state custody at OCPF.

6

5.      At all material times, Defendants John Does 1-5 were other MTC employees and agents transacting business in New Mexico and acting under color of state law whose duties included securing OCPF, protecting the health, safety, and welfare of individuals held in custody there, including Plaintiff David Lee Bradshaw, and exercising the powers of a peace officer with respect to arrests and enforcement of laws when on the premises at OCPF under NMSA 1978, Sections 33-1-17(E), 33-1-10, and 29-1-1.

6.      At all material times, Defendant Board of County Commissioners of Otero County (Otero County) was a political subdivision of the State of New Mexico. Pursuant to NMSA 1978, Section 4-46-1, all suits or proceedings against a county are to be brought in the name of the board of county commissioners of that county. At all material times, Otero County was a governmental entity and local public body as those terms are defined in Sections 41-4-3(B) and (C) of the New Mexico Tort Claims Act (NMTCA), as amended.

7.      At all material times, Defendant Otero County owned, funded, and contracted for the operation and maintenance of the buildings, machinery, equipment, and furnishings at OCPF located in Otero County, New Mexico within the meaning of Section 41-4-6 of the NMTCA. OCPF also contained a county-owned medical unit which operated as an infirmary, clinic, or like facility within the meaning of Section 41-4-9 of the NMTCA. As an owner and contractor at OCPF, Defendant Otero County was under a duty to comply with statutes and laws of New Mexico, including NMSA 1978, §§ 9-3-1 to 9-3-13 and 33-2-1 to 33-2-51, and their implementing rules, regulations, and policies, which required the County to provide for the safe housing and care of inmates held in state custody at OCPF, including Plaintiff David Lee Bradshaw.

8.      At all material times, Defendant David Black was a resident of Otero County, New Mexico who was employed on a full-time, salaried basis as Otero County Sheriff. Defendant Black and other members of the Otero County Sheriff's Office who responded to calls for service at

7

OCPF and were charged with investigating criminal offenses there fall under the statutory definition of "law enforcement officers" in Section 41-4-12 of the NMTCA, as amended. Additionally, Defendants Black and Otero County were invested with policy-making authority as well as direct supervisory control over other County employees.

9.     At all material times, Defendants Black and John Does 6-10 were public employees of Otero County acting under color of state law within the scope of their duties under Section 41-4-3 of the NMTCA, and as law enforcement officers for purposes of Section 41-4-12 of the NMTCA. Those duties included investigating all violations of the criminal laws of the state which are called to their attention, taking adequate action to protect a citizen from imminent danger and injury, and diligently filing a complaint or information when reasonably prudent to do so under the circumstances as required under NMSA 1978, Sections 4-41-2, 4-37-4, and 29-1-1.

10.     At all material times, Defendant New Mexico Corrections Department (NMCD) was a state agency and government entity with its principal offices in Santa Fe County, New Mexico that contracted for the operation and maintenance of buildings, machinery, equipment, and furnishings to house inmates in state custody, including those in custody at OCPF. At all material times, Defendant NMCD and its employees, agents, and contractors were under a duty to comply with statutes and laws of New Mexico, including NMSA 1978, §§ 9-3-1 to 9-3-13 and 33-2-1 to 33-2-51, and their implementing rules, regulations, and policies, which required them to provide for the safe housing and care of inmates held in state custody. Additionally, Defendant NMCD and its employees, agents, and contractors were under a duty to examine and inquire into all matters connected with the government, discipline, and police of the corrections facilities and the punishment and treatment of prisoners under NMSA 1978, Section 33-2-11.

11.     Defendant Alisha Tafoya Lucero was a resident of Santa Fe County, New Mexico, who was employed on a full-time salaried basis as the Secretary of NMCD. At all material times,

Defendant Lucero was invested with policy-making authority as well as direct supervisory control over John Does 11-15, other public employees, other law enforcement officers, and inmates in state custody.

12.     Defendants Lucero and John Does 11-15 were public employees of NMCD acting under color of state law within the scope of their duties under Section 41-4-3 of the NMTCA, and as law enforcement officers for purposes of Section 41-4-12 of the NMTCA, as amended. Those duties required them to comply with statutes and laws of New Mexico, including NMSA 1978, §§ 9-3-1 to 9-3-13 and 33-2-1 to 33-2-51, and their implementing rules, regulations, and policies, providing for the safe housing and care of inmates held in state custody at OCPF, including Plaintiff David Lee Bradshaw. Additionally, Defendants Lucero and John Does 11-15 were under a duty to examine and inquire into all matters connected with the government, discipline, and police of the corrections facilities and the punishment and treatment of prisoners under NMSA 1978, Section 33-2-11. They were also charged with exercising the powers of a peace officer with respect to arrests and enforcement of laws when on the premises at OCPF under NMSA 1978, Sections 33-1-10 and 29-1-1.

## JURISDICTION, VENUE, AND NOTICE

13.     This Court has original jurisdiction over Mr. Bradshaw's civil rights claims under 42 U.S.C. Section 1983 because they present a federal question under 28 U.S.C. Sections 1331 and 1343.

14.     This Court has supplemental jurisdiction over Mr. Bradshaw's state-law claims because they meet the criteria for supplemental jurisdiction in 28 U.S.C. Section 1367 and form part of the same case or controversy as his federal civil-rights claims.

15.     Venue in the District of New Mexico is authorized pursuant to 28 U.S.C. Section 1391 because Defendants reside in and are subject to personal jurisdiction in this district, events

or omissions giving rise to Plaintiff's claims occurred here, and property that is the subject of the action is situated here.

16.     Defendants Otero County and NMCD received timely actual and written notice of Plaintiff's intent to file claims against them under Section 41-4-15 of the NMTCA.

**FACTUAL BASIS FOR THIS LAWSUIT**

**A.    Mr. Bradshaw's career as a law enforcement officer and prosecution witness.**

17.     Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully stated herein.

18.     Before becoming an inmate in July 2019, Mr. Bradshaw was a certified law enforcement officer employed by the Chaves County Sheriff's Department in Chaves County, New Mexico. Before working as a Chaves County Sheriff's Deputy, Mr. Bradshaw was employed as a certified law enforcement officer in Los Alamos County, New Mexico. Mr. Bradshaw also worked as a detention officer in Los Alamos County, New Mexico, and as a corrections officer in Chaves County, New Mexico. He is a graduate of both the State's academy for correctional officers and its law enforcement academy in Santa Fe, New Mexico.

19.     During his career in law enforcement and corrections, Mr. Bradshaw had numerous interactions with inmates and criminal suspects. He testified as a witness for the prosecution in many criminal cases. He also served as a trainer and taught courses to other detention officers while working for Los Alamos County.

**1.      Mr. Bradshaw's role as a prosecution witness in two murder-for-hire cases in Dona Ana County.**

20.     While on duty as a Chaves County Sheriff's Deputy on or about February 14, 2018, Mr. Bradshaw conducted a traffic stop based on a speeding violation, which resulted in the arrest of Edward Alonso. Mr. Bradshaw observed that Mr. Alonso did not have a valid driver's license

and attempted to switch seats with the passenger and hide in the back of the vehicle during the traffic stop. In a search that followed, Mr. Bradshaw found controlled substances, a nine-millimeter handgun with a large capacity magazine, and over 50 rounds of ammunition in the vehicle. Mr. Alonso had a prior criminal record which prohibited him from possessing such a firearm.

21.     Following the traffic stop, Mr. Alonso disclosed information regarding a murder-for-hire conspiracy in which two other individuals, Cristal Cardenas and Luis Flores, allegedly hired Mr. Alonso to kill her ex-boyfriend, Mario Hernandez Cabral. Mr. Alonso and his female passenger were allegedly travelling back to Roswell, New Mexico, from the home of Mr. Cabral in Garfield, New Mexico, at the time Mr. Bradshaw initiated the traffic stop.

22.     After Mr. Alonso was taken into custody, Ms. Cardenas and Mr. Flores allegedly continued their involvement in the conspiracy to murder Mr. Cabral. Mr. Cabral and another woman, Vanessa Mora, were shot and killed in their home in Garfield, New Mexico on March 25, 2018, allegedly as a result of this murder-for-hire conspiracy.

23.     Based on his involvement in the traffic stop of the vehicle Mr. Alonso was driving on or about February 14, 2018, Mr. Bradshaw was listed as a trial witness for the prosecution in several cases filed in Dona Ana County District Court:  *State v. Alonso*, No D-307-CR-201800733 (charges of conspiracy to commit first degree murder and criminal solicitation to commit first degree murder filed June 13, 2018), *State v. Cardenas*, No. D-307-CR-2018-00371 (charges of first degree murder, conspiracy resulting in death, and criminal solicitation to commit first degree murder filed March 28, 2018), and *State v. Flores*, No. D-307-CR-2018-00372 (charges of first degree murder, and criminal solicitation to commit first degree murder filed March 28, 2018).

24.     Court records show that after several continuances of the trial date, Mr. Alonso entered a guilty plea in No. D-307-CR-2018-00733 on March 1, 2021. Court records show that the charges against Ms. Cardenas in No. D-307-CR-2018-00371 are currently scheduled for a jury

trial commencing March 7, 2022, with the jury trial on the charges against Mr. Flores in No. D-307-CR-2018-00372 to follow on April 4, 2022, after numerous continuances of previous trial settings. Mr. Bradshaw is still listed as a trial witness for the prosecution in those cases.

25.     Following Mr. Bradshaw's discovery of the firearm in the vehicle Mr. Alonso had been driving at the time of the traffic stop on or about February 14, 2018, Mr. Alonso was also charged with being a felon in possession of firearm in a case captioned *United States v. Alonso*, No. 18cr2517 (D.N.M. complaint filed March 29, 2018). Court records show that Mr. Alonso pleaded guilty to those federal charges on August 6, 2018, and was sentenced to 37 months of confinement at the Federal Correctional Institute in Florence, Colorado.

### 2.     The events leading to Mr. Bradshaw's criminal conviction for conduct that did not violate clearly established law.

26.     On or about March 18, 2018, less than a month after the traffic stop which led to the charges against Mr. Alonso described above, Mr. Bradshaw was driving in his personal vehicle when he encountered another vehicle driving recklessly. In the interest of public safety, Mr. Bradshaw followed the vehicle to a residence in Roswell and called for another deputy on duty to respond.

27.     After coming to a stop in front of the residence, Mr. Bradshaw and the driver of the other vehicle, Mario Rosales, engaged in a verbal exchange in which Mr. Bradshaw announced his presence as a law enforcement officer and showed his badge to Mr. Rosales. Mr. Rosales verbally asserted his right to openly carry a firearm, which he displayed to Mr. Bradshaw.

28.     Even though he was not arrested or taken into custody by Mr. Bradshaw or the other sheriff's deputy who responded to the scene, Mr. Rosales filed a civil lawsuit against Mr. Bradshaw and the Chaves County Sheriff based on the March 18, 2018, incident described above. The Honorable James O. Browning, United States District Judge, granted a motion to dismiss Mr.

Rosales' federal claims in that lawsuit. Even assuming the truth of Mr. Rosales' erroneous factual allegations about how Mr. Bradshaw conducted himself during the incident, Judge Browning concluded that Mr. Bradshaw was entitled to qualified immunity because there was no clearly established law that prohibits an off-duty officer from conducting himself in that manner with regard to a suspect who displays a firearm on his person. Judge Browning further found that Officer Bradshaw's conduct was not particularly egregious. *See Rosales v. Bradshaw*, No. CIV 20-0751 JB/JHR, Doc. 42 (D.N.M. memorandum opinion filed Nov. 17, 2021).

29.     Nevertheless, court records indicate that on or about June 25, 2018, Otero County District Attorney John Sugg filed a criminal information against Mr. Bradshaw in Chaves County District Court based on the same incident which was the subject of Mr. Rosales's civil lawsuit. Upon information and belief, the criminal complaint against Mr. Bradshaw was declined by other District Attorney's offices in other New Mexico counties before the Otero County District Attorney decided to pursue it.

30.     After several district judges in Chaves County recused from the case, the Otero County District Attorney tried Mr. Rosales's case before Chaves County District Judge Raymond L. Romero in July 2019. Court records indicate that a jury found Mr. Bradshaw guilty of one count of aggravated assault based on the incident about which Mr. Rosales complained and also reached a guilty verdict on a charge of abuse of a child not resulting in death or great bodily harm based on the mere fact that one of Mr. Bradshaw's children was seated in the cab of his personal vehicle at the time of the incident involving Mr. Rosales.

31.     Court records further indicate that as a result of the Otero County District Attorney's criminal prosecution described above, the Chaves County District Court sentenced Mr. Bradshaw to two consecutive one-year sentences of confinement with Defendant NMCD on October 11, 2019, with 91 days of pre-sentence confinement credit.

13

32.     Mr. Bradshaw had been testifying as a prosecution witness called by the Chaves County District Attorney's Office in several criminal cases up until the time of the criminal trial in which he was a defendant. At the time he was taken into custody by Defendant NMCD after that trial, Mr. Bradshaw was still listed as a prosecution witness in the Dona Ana County District Court cases cited above.

**B.      Mr. Bradshaw's wrongful incarceration at OCPF.**

**1.      Mr. Bradshaw's intake screening and classification.**

33.     Defendant NMCD initially took Mr. Bradshaw into custody at the Central New Mexico Correctional Facility (CNMCF) Reception and Diagnostic Center (RDC) in Valencia County, New Mexico, a state-run facility. Records indicate that while at CNCMF's RDC during this period, Mr. Bradshaw was "placed in RHU [restricted housing unit] due to being an ex-law enforcement, pending CBC review and placement." Court records further indicate that during this period and thereafter, Mr. Bradshaw was publicly identified as a witness for the prosecution in pending criminal cases based on his prior work as a certified law enforcement officer.

34.     When meeting with Defendant NMCD's Security Threat Intelligence Unit (STIU) and classification staff at CNMCF's RDC during their routine intake process at CNMCF, Mr. Bradshaw explained the situation regarding his career in law enforcement and corrections, as well as his status as a prosecution witness who was subject to being served with subpoenas to testify in criminal cases while he was in state custody. Mr. Bradshaw stated that it would be better to house him at a location where he would be separated from the general inmate population with appropriate security measures in place.

35.     Mr. Bradshaw was told that these factual details did not matter and were not of interest to Defendant NMCDF's classification and STIU staff at CNMCF. Instead, they followed a systemic policy, custom, and practice of using an arbitrary and inflexible rule that any reporting

of law enforcement or corrections experience by an inmate automatically resulted in placement in one of two dormitories at OCPF, without regard to other factors such as the nature and extent of that experience, whether it made the inmate subject to being called as a witness for the prosecution in criminal cases during their incarceration, the type of criminal cases in which the inmate would be called to testify, what was actually going on in the dormitories at OCPF to which the inmate would be assigned, or who else was housed in those dormitories at the time.

36.     The arbitrary and inflexible classification rule that Defendant NMCD's staff applied to Mr. Bradshaw, and which Defendant MTC's staff later ratified, was not and is not a reliable, valid, or tested measure of an inmate's risk of exposure to harm or propensity for misconduct while in state custody. Defendants NMCD, Lucero, MTC, and Martinez knew of these defects in the classification rule described above but made a deliberate decision to ignore the risks this rule created and to continue directing their respective staffs to utilize it anyway.

37.     Through his initial medical screening at CNMCF's RDC, Defendant NMCD's staff, and later Defendant MTC's staff, were notified that Mr. Bradshaw had significant medical conditions that required ongoing treatment, including diabetes, hypertension, rheumatoid arthritis, and gout. Mr. Bradshaw was prescribed medications for these conditions during his period in state custody, and these conditions also placed him at a heightened risk of contracting other illnesses.

38.     Again, the defective classification system that Defendant NMCD utilized and Defendant MTC ratified did not properly account for Mr. Bradshaw's serious medical conditions, either alone or in combination with his law enforcement and corrections experience described above. Defendants NMCD, Lucero, MTC, and Martinez knew that the provision of health care services at OCPF and CNMCF was inadequate and dysfunctional on a systemic level, but they decided to ignore those facts and continue directing their staffs to house Mr. Bradshaw and

similarly situated inmates at facilities where they would not receive adequate care for their serious medical needs.

39.     Despite the known risks associated with his significant medical conditions and his status as an ex-law enforcement officer and ex-corrections officer who was publicly identified as a witness for the prosecution in pending criminal cases, records produced by Defendant NMCD indicate that Mr. Bradshaw was transferred to the Otero County Prison Facility (OCPF) in Otero County, New Mexico on or about December 5, 2019. This transfer decision was based on the above-described policy, custom, and practice of sending all inmates who reported any law enforcement or corrections experience to OCPF, regardless of the circumstances.

**2.     Mr. Bradshaw's placement in Unit S2 at OCPF.**

40.     During the time period relevant to this Complaint, Defendants NMCD and MTC classified inmates according to four custody levels (I, II, III, and IV) based on a faulty, unverified, and unreliable assessment of each inmate's risk of violence and escape. Defendants NMCD and MTC classified Mr. Bradshaw as a Level II inmate and sometimes housed Level II inmates in a dormitory setting.

41.     Despite their knowledge and documented recognition that Mr. Bradshaw was a former law enforcement officer and current prosecution witness with significant medical conditions, Defendants MTC, Martinez, and NMCD deliberately elected to house Mr. Bradshaw in the same open dormitory as other inmates who posed a significant and particularized danger to him.

42.     According to NMCD records, the Initial Classification Committee at OCPF assigned Mr. Bradshaw to general population in Unit S2. Unit S2 is a 22-bed open dormitory in the OCPF where inmates live in close quarters and sleep in bunkbeds located immediately adjacent to one another without walls or dividers separating them. Upon information and belief, the Unit

S2 dormitory at OCPF did not comply with minimum space requirements of the 2020 revision to the *Duran* consent decree during the time period relevant to this Complaint.

43.     Under Defendant MTC's management, there was no corrections officer stationed in Unit S2 at the time Mr. Bradshaw was housed there. To the extent Unit S2 received any attention from corrections staff at OCPF, it occurred on an occasional, roving basis by staff who were concurrently assigned to other areas of the facility.

44.     As Warden of OCPF, Defendant Martinez reviewed staffing rosters, shift logs, inmate counts, STIU threat assessments, and similar records on a regular basis. He therefore knew that Unit S2 was understaffed and overcrowded during the time Mr. Bradshaw was incarcerated there. He could also plainly see how understaffed and overcrowded some units in the facility were as he walked through the facility.

45.     Although in 2013 NMCD had announced plans to use Unit S2 for housing inmates who were ex-law-enforcement officers, upon his placement in that unit in December 2019 Mr. Bradshaw learned that most of the inmates assigned to the Unit S2 dormitory with him were not former law enforcement officers. Mr. Bradshaw also learned that some of the inmates housed with him in the Unit S2 dormitory were or should have been assigned custody levels higher than Level II or special management categories. Moreover, corrections staff allowed inmates from other units to enter the Unit S2 dormitory from time to time, as well as allowing inmates from different units to mingle in common areas of the facilities at OCPF. Those inmates also were not former law enforcement officers and, upon information and belief, were or should have been assigned higher custody levels or special management categories.

46.     Upon his placement in the Unit S2 dormitory at OCPF in December 2019, Mr. Bradshaw discovered that most of the correctional officers staffing the facility were not state-certified. The ones who did have some type of certification only received a 40-hour training and

did not go through the State of New Mexico's correctional academy or a satellite academy which met state standards. Mr. Bradshaw was familiar with such training and certification requirements based on his own training and work experience as a former corrections officer and a former law enforcement officer who had graduated from the State's corrections and law enforcement academies.

47.     As Warden of OCPF, Defendant Martinez regularly reviewed employment and training records as the company's employees at OCFP were hired and promoted, and he was familiar with the command staff at the facility. He therefore knew that many of the corrections officers at OCPF had not graduated from a corrections academy, and they lacked adequate training and supervision.

48.     Because they were not properly trained or supervised, Mr. Bradshaw observed that corrections staff at OCPF acted inappropriately and unlawfully with the inmate population. Several of the corrections officers he observed at OCPF lacked a command presence or appropriate professional boundaries, fraternized with inmates, engaged in unlawful transactions with them which resulted in special privileges being granted to certain inmates, and conspired with those inmates to falsify records and to cover up their unlawful activities and dereliction of duties.

49.     As a result of the inappropriate and unlawful relationships between corrections staff and certain inmates at OCPF, Mr. Bradshaw learned that certain inmates at the facility had access to the prison's records, exercised substantial control over functions that were supposed to be performed by corrections staff, and were using such access and control to engage in unlawful conduct, including extortion, theft, and falsification of records.

   3.     **The extortion and threats directed against Mr. Bradshaw at OCPF.**

50.     Based on Mr. Bradshaw's observations and experience, three other inmates in Unit S2 at OCPF acted as leaders of the extortion racket in Unit S2 who directed or participated in the

unlawful conduct of other inmates, corrections officers, and staff at OCPF. These three other inmates were Mario E. Padilla, Jesus "Jesse" Soto, and Joseph Apodaca.

51.     Court records show that during the time Mr. Bradshaw was incarcerated with him in the Unit S2 dormitory at OCPF, Mario E. Padilla was serving a sentence based on convictions for battery upon a peace officer, resisting/evading an officer, aggravated fleeing an officer, criminal damage to property, possession of a controlled substance, and receiving/transferring a stolen vehicle in Torrance County District Court in 2017. According to his court records, Mr. Padilla has a lengthy criminal history and was sentenced as a habitual offender for a total term of eight years commencing on May 29, 2018.

52.     Court records show that during the time Mr. Bradshaw was incarcerated with him at OCPF, Jesus "Jesse" Soto was serving a lengthy sentence based on convictions for shooting at a dwelling resulting in great bodily harm, conspiracy, and tampering with evidence in *State v. Soto*, No. D-506-CR-202100478. Mr. Soto also bragged to other inmates that he had done federal time and killed someone in Hobbs, New Mexico.

53.     Court records show that during the time Mr. Bradshaw was incarcerated with him at OCPF, Joseph Apodaca was serving a lengthy sentence based on convictions for criminal sexual penetration in the first degree and tampering with evidence in *State v. Apodaca*, No. D-202-CR-201502971. The gruesome facts regarding Mr. Bradshaw's crimes are too offensive to bear repeating here but are detailed in a published opinion. *See State v. Apodaca*, 2021-NMCA-001, *cert. granted*, No. S-1-SC-38288 (N.M. S. Ct. Nov. 25, 2020).

54.     As Warden of OCPF, Defendant Martinez knew of the lack of professional boundaries between inmates and corrections staff at OCPF during the time Mr. Bradshaw was housed there. Defendant Martinez and many of his command staff received haircuts from Mr. Padilla and granted Mr. Padilla special privileges based on their fraternization with him. Defendant

Martinez and his administrative staff employed Mr. Soto to do clerical work for them and gave him special privileges, including access to records regarding other inmates. Defendant Martinez and his staff also employed Mr. Apodaca as the head recreation porter and gave him special privileges in exchange for falsifying records as further described below.

55.     Upon information and belief, neither Mr. Padilla nor Mr. Soto nor Mr. Apodaca were former law enforcement officers or had records commensurate with that of Mr. Bradshaw at the time they were incarcerated with him in the Unit S2 dormitory at OCPF.

56.     Based on a comparison of their criminal records with Mr. Bradshaw's record as a former law enforcement officer and witness for the prosecution in pending criminal cases, as well as their open display of extortionate and unlawful behavior in the Unit S2 dormitory, Defendants knew and should have known that it was not safe to house Mr. Bradshaw in the same open-dormitory unit as Messrs. Padilla, Soto, or Apodaca.

57.     Within a week of his arrival at OCPF, Mr. Bradshaw was told that he had to hold a job at the facility, participate in a program, or both, in order to receive good time and parole. Mr. Bradshaw was approached by Mr. Soto, who asked if he was interested in a job as a recreation porter. Mr. Bradshaw was also told that Mr. Soto could help him get into at least one program.

58.     Mr. Bradshaw told Mr. Soto he would be interested in a recreation porter job and put in written requests for that job. Mr. Soto informed Mr. Bradshaw that Mr. Soto would take care of the requests and had set up a job interview for him with the correction officer in charge of recreation, Officer Castillo. Mr. Bradshaw then performed cleaning duties from mid-December until he received the recreation job on December 23, 2019, and was officially hired on December 29, 2019.

59.     Mr. Bradshaw was scheduled to work as a recreation porter at OCPF for five hours per day with Wednesdays and Thursdays off. In fact, Mr. Bradshaw was only allowed to work at this job about 30 minutes per day, when he was allowed to work at all.

60.     Mr. Bradshaw told several people at OCPF, including corrections officers, that he was not comfortable being paid for hours that he was not allowed to work. In response to this concern, he was told to keep quiet about it or he would get in trouble or face retaliation from other inmates who benefited from this arrangement and did not want Mr. Bradshaw to ruin it for them.

61.     In addition to arranging for the recreation porter job described above, Mr. Soto introduced Mr. Bradshaw to Mr. Padilla and Mr. Apodaca, who were also housed in the Unit S2 dormitory at OCPF. Mr. Apodaca was also employed as a recreation porter. Mr. Padilla worked in the facility as a barber.

62.     Mr. Bradshaw was told that if he wanted a haircut, he would have to pay Mr. Padilla using one of the tokens that inmates purchased from the commissary at OCPF to buy soft drinks. Most inmates in Unit S2 paid Mr. Padilla for haircuts. As one of the leaders of the extortion racket in Unit S2 at OCPF, Mr. Padilla soon started charging Mr. Bradshaw two tokens for a haircut. Mr. Padilla openly conducted such transactions in view of the video cameras at the facility, with the knowledge of Defendant Martinez and the corrections officers staffing the unit.

63.     Mr. Padilla also provided haircuts to corrections officers and administrators, including Defendant Martinez and his command staff. They allowed him special privileges such as extra food from the cafeteria at OCPF, in exchange for providing haircuts and other favors for them.

64.     Mr. Bradshaw began to notice that, in addition to controlling haircuts, the recreation porter positions, and program assignments for Unit S2 at OCPF, Messrs. Padilla, Soto, and Apodaca had many special privileges at the facility. They could change other inmates' bunk

assignments and were generally successful in getting other inmates to comply with their demands and threats. Based on their special relationship with Defendant Martinez and his command staff, Messrs. Padilla, Soto, and Apodaca were allowed to bring their friends or associates who were housed in other units into the Unit S2 dormitory for haircuts and other transactions, even if they were not eligible to visit the unit based on their classification levels or special management status. Corrections staff were aware of and allowed Messrs. Padilla, Soto, and Apodaca to engage in these activities, and these corrections officers' participation was required to open doors in the facility so that other inmates could enter and exit Unit S2 for purposes of their meetings with Messrs. Padilla, Soto, and Apodaca.

65.     Mr. Soto approached Mr. Bradshaw and told him that he owed Mr. Soto for getting him a job as a recreation porter and getting him into programs. Specifically, Mr. Soto instructed Mr. Bradshaw that he was required to pay Mr. Soto with earbuds and a watch, both of which could be ordered through the commissary at OCPF. Under duress, Mr. Bradshaw ordered the earbuds and watch Mr. Soto requested, but never received those items from the commissary at OCPF. Upon information and belief, the commissary delivered the earbuds and watch directly to Mr. Soto.

66.     Mr. Soto backed up his extortionate demands with threats to Mr. Bradshaw. Specifically, Mr. Soto explained to Mr. Bradshaw that Mr. Soto knew how much money Mr. Bradshaw had in his inmate account at the facility and even knew who and when people sent requests or reported things to the administration or command staff at the facility, because he worked for them. Mr. Soto further explained to Mr. Bradshaw that if he did not pay, there were ways that he could lose good time or get in trouble.

67.     For example, Mr. Soto explained to Mr. Bradshaw that drugs could be planted in his belongings, to which other inmates had access in the open dormitory environment of Unit S2,

or Mr. Bradshaw could be written up for fighting. Mr. Bradshaw was later subjected to both of these methods of extortion.

68.     Mr. Bradshaw was presented with a false claim by a correctional officer at OCPF to the effect that contraband was found in a letter sent to him by one of his family members. Upon information and belief, correctional officers and inmates at OCPF who were involved in trafficking contraband at the facility had the ability to plant controlled substances or other contraband in an innocent, unsuspecting victim's mail or personal items, then threaten to disclose the planted contraband to law enforcement authorities as a means of securing the victim's silence or other benefits which were needed to carry out illegal drug trafficking and extortion rackets at OCPF.

69.     Mr. Bradshaw responded to this extortion attempt by denying that anyone sent him contraband in the mail and inviting corrections officers to report the matter to the New Mexico State Police so they could conduct a proper law-enforcement investigation of that false claim. No such investigation occurred, and no one was ever charged with making this false and extortionate claim. Neither Mr. Bradshaw nor anyone who sent him mail at the facility was ever charged with possession or distribution of contraband. To prevent future extortion attempts of this kind, Mr. Bradshaw instructed his family member to stop sending mail to him at OCPF.

70.     While at OCPF, Mr. Bradshaw encountered several individuals whom he had met in the past when they were criminal suspects and Mr. Bradshaw was a law enforcement officer. These individuals included an inmate named Bingham who bunked right next to Mr. Bradshaw in the Unit S2 dormitory at OCPF. During his prior work as a law enforcement officer, Mr. Bradshaw started the criminal investigation that led to Mr. Bingham's prison sentence by reporting his suspected unlawful activity. Messrs. Soto, Apodaca, and Padilla knew that Mr. Bradshaw was a former law enforcement officer and that he was involved in the criminal investigation which led to Mr. Bingham's prison sentence. Mr. Soto stated to Mr. Bradshaw that the bunk assignments

placing Mr. Bradshaw right next to Mr. Bingham were "karma" and that Mr. Bradshaw would have to pay Mr. Soto if he wanted to be moved to a different bunk, away from Mr. Bingham.

71.     Mr. Padilla openly and repeatedly told Mr. Bradshaw that he "hates cops." Messrs. Padilla, Soto, and Apodaca also told him they did not like Mr. Bingham, the inmate who bunked next to him. Under duress from their extortionate threats during the first several weeks of his incarceration at OCPF, Mr. Bradshaw ordered the items Mr. Soto wanted from the commissary and paid the tokens Mr. Padilla demanded while he looked for safe options to report these inmates' extortion racket to the proper authorities and extricate himself from it. Mr. Bradshaw also attempted to distance himself from Mr. Bingham by telling other inmates that Mr. Bradshaw did not like him, so that Messrs. Soto, Apodaca, and Padilla would not target him.

72.     To earn good time, Mr. Bradshaw enrolled in two classes or programs at OCPF: one for substance abuse issue and another called "Moral Recognition Training." Although he was not particularly in need of training on either of these subjects, Mr. Bradshaw found that these were the only classes or programs available to him at OCPF that were not designed for sex offenders.

73.     Mr. Padilla was also enrolled in the same class regarding substance abuse issues that Mr. Bradshaw attended. During the class and in the Unit S2 dormitory, Mr. Padilla kept an eye on Mr. Bradshaw by watching and listening to Mr. Bradshaw's conversations with other inmates.

74.     Mr. Padilla asked Mr. Bradshaw why he talked to Mr. Bingham if he did not like him. Mr. Bradshaw responded by making an excuse to try to defuse the situation, knowing that Mr. Padilla hated Mr. Bingham and was looking to pick a fight with him.

75.     Mr. Bradshaw was particularly vulnerable to threats involving his food and personal items because he is an insulin-dependent diabetic who requires a special diet and takes several prescription medications daily. Mr. Bradshaw was supposed to be placed on a diabetic diet,

and other inmates knew of his medical conditions and special diet as well. But Mr. Bradshaw rarely received a diabetic tray for the meals that OCPF supplied to him. Without his diabetic tray, Mr. Bradshaw was forced to bargain with other inmates to obtain food items such as lettuce and hard-boiled eggs so he could try to regulate his blood-sugar levels.

76.     Mr. Bradshaw noticed that other items he purchased from the commissary at OCPF, such as soap and coffee, began to go missing from his locker in the Unit S2 dormitory. Mr. Padilla would also come to Mr. Bradshaw's bunk area, look in his locker, and take small items such as candy.

77.     Some inmates made crafts to send home to loved ones. Mr. Bradshaw received some paper swans and a paper snake from another inmate for this purpose and agreed to give that inmate several bags of coffee and tokens. Mr. Soto confiscated some of these items and claimed that they were owed to him by the inmate from whom Mr. Bradshaw had received the craft items.

78.     Mr. Bradshaw observed that inmates at OCPF would be directed to sign papers placed by the board in Unit S2. By signing these papers, inmates were falsely representing that they had played certain games for specified times in their units, even though most of these games were never played. In exchange for making false representations on these papers, inmates who signed the papers could appear in the Rec 2 gym at OCPF and receive snacks from the commissary, typically at the first of the month. These snacks consisted of granola bars, Ramen noodle soups, and candy bars.

79.     Mr. Bradshaw later discovered that Mr. Apodaca was in charge of auditing these papers, which were placed in each unit at OCPF. Upon information and belief, the papers were used to document recreation hours that Defendants MTC and Otero County were required to provide under their contracts with Defendant NMCD so that Defendants MTC and Otero County could show compliance with contractual requirements. Inmates were encouraged or told to sign

these papers even if they did not participate in the designated recreation activities so that the papers would show more recreation time than was actually provided or utilized. The inmates who provided signatures would then receive payment in the form of snacks.

80.     Under this scheme, Mr. Apodaca received sacks of commissary snacks to share with Messrs. Padilla and Soto, in addition to being paid as a recreation porter for hours he did not actually work. Mr. Apodaca regulated how many snacks each of the other inmates would receive. If an inmate was considered a friend or associate of Messrs. Padilla, Apodaca, and Soto, that inmate would receive more snacks.

81.     Mr. Bradshaw overheard Officer Castillo, the corrections officer in charge of recreation, speak with Mr. Apodaca and tell him how many hours of recreation time they were short for the month. It was then Mr. Apodaca's job to make up those hours by obtaining signatures on the paperwork falsely stating that inmates had spent them playing games. Stacks of recreation time paperwork were delivered to Unit S2 from Officers Castillo or Betancourt to Mr. Apodaca two to three times per week. Mr. Apodaca would review that paperwork at the break tables in the Unit S2 dormitory.

82.     In return for their participation in falsifying paperwork, giving haircuts, and doing other favors, Defendant Martinez, his command staff, and several of the corrections officers at OCPF allowed Messrs. Soto, Apodaca, and Padilla to extort Mr. Bradshaw and other inmates with impunity.

83.     Defendant MTC provided no meaningful grievance procedure at OCPF through which Mr. Bradshaw or the other extorted inmates could report or seek redress for these illegal activities. The drop box provided for inmate grievances was closely monitored by inmates running the extortion racket at OCPF and their co-conspirators among the corrections staff. Filing a grievance at OCPF was not only ineffective but was also likely to result in retaliation.

4.    **Mr. Bradshaw's efforts to extricate himself from the extortion racket and report threatening and unlawful activity at OCPF.**

84.    Mr. Bradshaw's family submitted numerous requests for visitation with him while he was incarcerated at OCPF. Mr. Bradshaw also requested a meeting with the employee at OCPF in charge of approving such visits. That employee, Mr. Rivero, called Mr. Bradshaw into his office, showed him his family's visitation requests, and stated he was busy so he did not know when they would be approved. That meeting was nine weeks after the visitation requests were sent.

85.    It was well known among inmates not to submit any grievances regarding Mr. Rivero's failure to process visitation requests, because he had significant decision-making authority with respect to releasing inmates on parole and would retaliate against those who complained about him. As with the delays in processing visitation requests, inmates were not being released on parole on their scheduled dates.

86.    Mr. Bradshaw finally got approved for a special visit from his wife in February 2020. During that visit, he told her about the extortion racket at OCPF and advised her to tell his sister and others not to send money to his inmate account because he was getting extorted.

87.    Mr. Bradshaw also made several attempts to get a legal appointment scheduled with his attorney, Mr. Snowden, so he could confidentially report the extortion racket and other problems at OCPF without facing retaliation from inmates, corrections officers, and other staff that jeopardized his personal health and safety. But requesting a legal call with an attorney required Mr. Bradshaw to fill out paperwork that was processed or accessed by the same inmates and staff at OCPF who were involved in operating the extortion racket there. Thus, Mr. Bradshaw's requests for an attorney call were refused, and he was not scheduled for an attorney call until March 5, 2020. His request to speak with his attorney on that scheduled call date was also refused by the staff at OCPF.

27

88.     Mr. Bradshaw could not safely report conditions at OCPF to administrators or caseworkers there, because he knew their clerks were associates of Messrs. Soto, Apodaca, and Padilla, and they were involved in the extortion racket at OCPF. Allowing participants in that extortion racket to access records and communications of other inmates, including Mr. Bradshaw, was one of the ways in which the staff at OCPF cooperated with the racketeering leaders. Because his inmate records and communications were screened by other inmates involved in the extortion racket, Mr. Bradshaw could not report extortion attempts or other unlawful activity at OCPF without being discovered by those other inmates and subjected to retribution by the leaders of the extortion racket.

89.     In addition to attempting to find a safe avenue for reporting the unlawful activity taking place at OCPF, Mr. Bradshaw started taking countermeasures to make himself less susceptible to further extortion and theft from other inmates. Specifically, he stopped paying for his haircut from Mr. Padilla and began cutting his own hair. He purchased a padlock and started locking the drawer under his bunk where he stored his personal items. He bought all his commissary items to last several months so that there would not be much money left in his commissary account.

90.     Mr. Bradshaw thought that these countermeasures would make it more likely that Messrs. Padilla, Soto, and Apodaca would leave him alone and stop extorting him. But instead, Mr. Bradshaw's efforts to protect himself from extortion and theft just made Mr. Padilla and his co-conspirators in the extortion racket angrier. Tensions in Unit S2 grew, and Mr. Padilla confronted Mr. Bradshaw about who was cutting his hair, as well as his interactions with Mr. Bingham and how he was handling commissary items.

91.     The extortion, falsification of records, and unlawful activities committed by Messrs. Padilla, Soto, and Apodaca as described above were done openly with the knowledge of

Defendant Martinez, members of his command staff, and several of the corrections officers and other staff at OCPF who were assigned to monitor inmates and secure the facility.

92.     The extortion, falsification of records, and other unlawful activities in which inmates and correctional officers participated at OCPF as described above were aided, abetted, and enforced through violence and threats of violence against inmates who did not cooperate or acquiesce to them.

93.     After spending more than two months as an OCPF inmate, Mr. Bradshaw's record of non-compliance with further extortion attempts, thefts, and other unlawful activity as described above led to hostility, threats, and retribution by the inmates leading the extortion racket at the facility.

    **5.**     **The violent attack on Mr. Bradshaw while housed at OCPF.**

94.     On or about Sunday, March 1, 2020, Mr. Padilla confronted Mr. Bradshaw regarding Mr. Bradshaw's record of non-compliance with Mr. Padilla's extortion attempts. Mr. Padilla expressed that he was upset because Mr. Bradshaw was no longer "buying" haircuts from Mr. Padilla in the Unit S2 dormitory. Mr. Padilla also complained that Mr. Bradshaw had borrowed a condiment from Mr. Bingham while eating a meal in the Unit S2 dormitory that afternoon, instead of "buying" such commissary items from Mr. Padilla. While Mr. Bradshaw was conversing with Mr. Bingham, Mr. Padilla called Mr. Bradshaw over to Mr. Padilla's barber chair, where Mr. Padilla was cutting the hair of one of his friends and associates in the extortion racket at the time.

95.     Mr. Padilla then asked Mr. Bradshaw why he was talking to Mr. Bingham if he did not like Mr. Bingham. Mr. Bradshaw responded that he was just "mooching" some hot sauce and that Mr. Padilla also "mooched" off people he did not like, including Mr. Bradshaw. Mr. Padilla took offense to Mr. Bradshaw's statement, called Mr. Bradshaw a "punk cop," and told him to go

to his bunk or Mr. Padilla was going to hit him. Mr. Bradshaw complied with that instruction, returned to his own bunk area, and continued eating his meal.

96.     The entire interaction between Mr. Padilla and Mr. Bradshaw in the Unit S2 dormitory described above took place in full view of the security cameras as well as the corrections officers assigned to monitor the S2 Unit at the time. Accordingly, Mr. Bradshaw looked for a corrections officer to intervene in the situation as he stood and ate his meal in his bunk area, while also keeping an eye on Mr. Padilla and his cohorts to make sure he was not attacked from behind by surprise.

97.     None of the corrections staff at OCPF entered the unit at the time or did anything to intervene in the situation. As the unit was a crowded, open dormitory, there was no safe place to which Mr. Bradshaw could retreat.

98.     Mr. Padilla, who was cutting another inmate's hair at the time of his initial confrontation with Mr. Bradshaw, stopped that haircut and walked over to Mr. Bradshaw's bunk area to escalate the confrontation by pushing and shoving Mr. Bradshaw. Mr. Bradshaw had no avenue for retreat because the area in which he was standing was surrounded on three sides by bunkbeds, and Mr. Padilla occupied the fourth, open side. With no assistance from other inmates or corrections officers, all that Mr. Bradshaw could do at that point was to make his way out of the confined bunk area in an attempt to move away from Mr. Padilla and toward the area where corrections officers could enter the unit. But Mr. Padilla tried to block Mr. Bradshaw's exit from the bunk area and continued pushing him. Again, no corrections officers intervened to stop Mr. Padilla's aggression.

99.     Nevertheless, Mr. Bradshaw continued his efforts to defuse the situation by repeatedly telling Mr. Padilla that "you don't want to do this," noting that initiating a fight could result in loss of good time.

100.     When Mr. Bingham attempted to step between Mr. Padilla and Mr. Bradshaw, Mr. Soto instructed Mr. Bingham to get out of the way or he would make the situation worse. In a further attempt to deescalate the situation and comply with the demands of the inmates running the extortion racket in the Unit S2 dormitory, Mr. Bradshaw also directed Mr. Bingham to step away and not become involved in an altercation.

101.     After Mr. Bingham stepped away, and despite Mr. Bradshaw's repeated pleas that "you don't want to do this," Mr. Padilla began striking Mr. Bradshaw with his closed fists, landing blows on each side of Mr. Bradshaw's head, breaking his jawbone on both sides of his face, damaging his teeth and mouth, and causing serious personal injuries that required emergency medical attention as well as multiple surgeries and long-term care.

102.     Mr. Bradshaw did not fight back during the attack. Instead, Mr. Bradshaw attempted to protect himself by holding onto Mr. Padilla after Mr. Padilla landed the first blows to his head so that Mr. Padilla could not land a final, fatal blow. As both men fell to the ground with Mr. Padilla on top of Mr. Bradshaw, Mr. Padilla continued punching at Mr. Bradshaw with all his might until he had exhausted himself and was out of breath. Messrs. Soto and Apodaca then stood by Mr. Padilla as he caught his breath.

103.     Mr. Padilla was not injured in the attack. Mr. Bradshaw, however, immediately recognized that he had been seriously injured and felt part of his jawbone sticking through an open wound in his mouth, which was bleeding.

104.     Although corrections officers were stationed in locations at OCPF where they could plainly see and respond to Mr. Padilla's extortionate confrontation with Mr. Bradshaw and the violent attack which followed, the corrections officers stationed at the facility on March 1, 2020, failed to do so. Instead, they did not even begin to respond until after Mr. Padilla finished his attack on Mr. Bradshaw several minutes after the confrontation began.

105.    According to surveillance video recordings produced by NMCD, a single corrections officer entered the Unit S2 dormitory about a minute after Mr. Padilla finished his violent attack on Mr. Bradshaw and directed Mr. Padilla to walk towards him while Mr. Bradshaw remained in his bunk area.

106.    After the corrections officer and Mr. Padilla walked out of camera range for about another minute, Mr. Padilla returned to the open dormitory in Unit S2 and was allowed to wash his hands, change clothes, gather his belongings, and interact with other inmates for about five more minutes before a second corrections officer arrived to handcuff him and physically escort him out of the dormitory. Messrs. Soto and Apodaca joined Mr. Padilla in the back of the unit and can be seen interacting with him on the video footage during this period of time.

107.    Mr. Bradshaw was not allowed to leave the open dormitory area of Unit S2 or seek medical attention for the injuries he sustained in the attack until Mr. Padilla returned to the dormitory and was engaged in the activities with Messrs. Soto and Apodaca described in the preceding paragraph.

108.    After Mr. Bradshaw was finally allowed to leave the open dormitory area of Unit S2 following the attack, he was handcuffed and taken to the medical unit at OCPF to be seen by a licensed vocational nurse, who told corrections staff at the facility that Mr. Bradshaw needed to be taken to the hospital for emergency medical treatment. Mr. Bradshaw then waited for approximately one hour for an ambulance to arrive and transport him to the University Hospital in El Paso, Texas with an escort of corrections officers from OCPF.

109.    While awaiting transport to the hospital after the attack, corrections officers at OCPF taunted and made fun of Mr. Bradshaw for "getting his ass beat" in the attack and wrote a report in which they mischaracterized the attack as "an altercation" between Mr. Padilla and Mr. Bradshaw—deliberately ignoring the obvious fact that Mr. Bradshaw did not initiate the attack or

fight back, and Mr. Padilla suffered no injuries. Corrections officers at OCPF also filed disciplinary charges against Mr. Bradshaw in which they falsely accused him of "fighting." Defendant Martinez was aware of this false report and noted his approval of the charges. On the way to the hospital, the transport officers told Mr. Bradshaw they had to be nice to Mr. Padilla so they would not get a bad haircut from him.

**6.    Neglect of Mr. Bradshaw's serious medical needs while housed at OCPF.**

110.    Mr. Bradshaw had been experiencing problems receiving care for his serious medical needs at OCPF even before he was attacked by Mr. Padilla, and these problems continued after the attack.

111.    While housed at OCPF, Mr. Bradshaw had trouble receiving his prescribed medications in a timely manner and was not provided with the diabetic meal trays he was medically authorized to receive.

112.    On one of the few occasions when he was actually seen by staff in OCPF's medical unit before the attack, Mr. Bradshaw was coerced into posing for photographs and giving a statement about the quality of medical care at the facility as a condition for his presence in the medical unit. He was told the contractor needed such materials for use in its promotional brochures. Mr. Bradshaw was then told his statements were not good enough for the contractor's promotional use because they did not include the names of the medical staff there.

113.    The medical unit at OCPF was not equipped or staffed to diagnose or treat the serious personal injuries Mr. Bradshaw sustained when Mr. Padilla violently attacked him. Accordingly, Mr. Bradshaw had to wait to be transported from OCPF to the emergency room at University Hospital in El Paso, where he arrived at approximately 6:30 p.m. on March 1, 2020.

114.    Mr. Bradshaw was admitted to the hospital later that evening and was scheduled for emergency surgery the next day. Upon intake, health-care providers in the hospital's

emergency room noted that Mr. Bradshaw had bilateral displaced mandible fractures with malocclusion, damage to two teeth, and was bleeding from a wound inside his mouth where a piece of his jawbone had broken through his skin and was exposed.

115.    A surgery team at the University Hospital in El Paso performed an initial round of surgery on Mr. Bradshaw on March 2, 2020, in which they attempted to repair a right subcondylar fracture, a right mandibular body fracture, and a left subcondylar fracture by attaching the fractured bones together and keeping them in place with a series of metal plates, screws, wires, and arch bars. The surgery team also noted damage to the root of at least one of Mr. Bradshaw's teeth but made an initial assessment that the damaged tooth may be salvageable and did not extract it.

116.    Following the initial round of surgery, Mr. Bradshaw's mouth was wired shut to keep the fractured bones in place and allow them to heal. He was placed on a liquid diet in which he had to receive food through a straw or syringe. He remained in the hospital for four days and was discharged back to OCPF on the evening of March 4, 2020, with the physicians' instructions to have him returned to the hospital for follow-up care on March 12, 2020.

### 7.    The inadequate response and attempt to cover up the violent attack on Mr. Bradshaw.

117.    Upon his return to OCPF, Mr. Bradshaw was initially housed in the medical unit there, where he was still on a liquid diet with his mouth wired shut from the surgery. The following morning, one of the transport officers who had taken Mr. Bradshaw from the hospital advised a Lieutenant that Mr. Bradshaw wanted to press charges against Mr. Padilla for battery.

118.    The Lieutenant met with Mr. Bradshaw in the Intake area of OCPF and required him to provide a sworn written statement as a prerequisite for filing such charges. Despite the fact that his mouth was wired shut and he was still suffering the acute effects from the attack by Mr. Padilla and ensuing surgery, Mr. Bradshaw provided a sworn written statement to the effect that

he wanted to press charges against Mr. Padilla and that Mr. Padilla needs to be on his "enemies list" so that he would not again be placed in the same housing unit with Mr. Padilla or his associates in the extortion racket at OCPF.

119.    Instead of contacting the New Mexico State Police, which normally handles investigations of alleged criminal activities by inmates in state custody, the Lieutenant at OCPF contacted a dispatcher for the Otero County Sheriff's Office and requested that she send a Sheriff's Deputy to take a report regarding a fight between two inmates that occurred on March 1, 2020. The dispatcher sent an Otero County sheriff's deputy to the Lieutenant's Office at OCPF without contacting the New Mexico State Police or redirecting the call to that agency.

120.    As a result of his visit with the Lieutenant at OCPF, the Otero County Sheriff's Deputy wrote a false report which mischaracterized the incident as a "mutual" fight between two inmates, in which both inmates "closed distance" and were "striking each other with hands and fists." Although Mr. Bradshaw told the Sheriff's Deputy what really happened during the incident, the Sheriff's Deputy falsely instructed Mr. Bradshaw that "the videos show both subjects engaged in a physical fight," without actually showing him any of the surveillance video footage.

121.    Mr. Bradshaw told the Otero County Sheriff's Deputy that he wanted to speak with his attorney, but he was not allowed to do so.  After this concerted effort by the Otero County Sheriff's Department and the Lieutenant at OCPF to intimidate and silence Mr. Bradshaw, the Otero County Sheriff's Deputy ended his report and took no further action on the information Mr. Bradshaw reported.

122.    After the Otero County Sheriff's Deputy finished speaking with Mr. Bradshaw, the Lieutenant wrote his own report, falsely backdated to March 1, 2020, in which he claimed to have conducted a "secondary interview" with Mr. Bradshaw regarding "allegations made by him that inmates within S2 dormitory were extorting him," in which Mr. Bradshaw allegedly "refused to

provide inmate names and information." The Lieutenant's report also served to cover up the unlawful activities that were occurring in the S2 Unit at OCPF without any legitimate law enforcement investigation of those activities.

123.    Mr. Bradshaw made efforts to contact his attorney, Mr. Snowden, during the period between his return from the hospital and his transfer from OCPF, but staff at OCPF suppressed those efforts. Mr. Bradshaw asked his caseworker at OCPF if he could speak with his attorney. She asked him why. When he told her he had an attorney call scheduled that day for parole purposes, she declined to allow the call and instead told Mr. Bradshaw he could try reaching his attorney after he was transferred to another facility.

124.    Mr. Bradshaw's attorney, Mr. Snowden, had a call scheduled with him on March 5, 2020, and attempted to call him at OCPF at that scheduled time before he was transported from OCPF. Mr. Bradshaw's attorney was unable to get through to him. At the scheduled time of the call, Mr. Bradshaw was watching the clock in a transport van parked by the gate inside OCPF where OCPF transport officers were holding him. The transport officers remained inside the gate at the time of the scheduled call and then parked the transport van in the parking lot while they retrieved snacks from their personal vehicles to take with them on the trip.

125.    After the interactions with OCPF staff described above, Mr. Bradshaw was transported from OCPF to CNMCF in Valencia County, New Mexico, where he arrived on the afternoon of March 5, 2020. Based on the transfer to CNMCF, the Disciplinary Hearing Officer at OCPF also requested a 30-day continuance of the disciplinary hearing regarding the false charge that Mr. Bradshaw was "fighting" with Mr. Padilla. Defendant Martinez reviewed the false charge and approved that request in his capacity as Warden of OCPF.

**C.      Mr. Bradshaw's continued incarceration at CNMCF and other facilities.**

      **1.      Neglect of Mr. Bradshaw's serious medical
           needs upon his transfer to CNMCF.**

126.     Mr. Bradshaw's serious medical needs were obvious and known to the staff at CNMCF when he arrived there on March 5, 2020. His jaw was still wired shut so tightly that no solid or even blended foods could pass through his teeth. He had dried blood on his lips from an internal wound to his mouth. And he was still on a liquid diet.

127.     Medical records produced by NMCD indicate that on March 9, 2020, health-care staff at CNMCF were concerned that Mr. Bradshaw's face had swollen, he was having problems swallowing, and the wound in his mouth may have become infected. His mouth was still wired shut, and he was still on a liquid diet.

128.     Records from the University Hospital in El Paso indicate that Mr. Bradshaw was scheduled for a follow-up appointment on March 12, 2020, with the medical providers who had done his surgery and treated him in the hospital from March 1, 2020, to March 4, 2020. Copies of the records noting the need for this follow-up appointment were provided to Defendants MTC and NMCD, and thus they were on notice of Mr. Bradshaw's need for a follow-up appointment with the specialized providers at University Hospital on March 12, 2020.

129.     Mr. Bradshaw did not receive the follow-up appointment with those providers on March 12, 2020. Despite knowledge of that appointment and the worsening conditions noted by NMCD's own health care staff on the medical records dated March 9, 2020, NMCD officials instead transferred Mr. Bradshaw to a detention facility in Dona Ana County, New Mexico, on March 11, 2020.

**2. Mr. Bradshaw's first transfer to and from the Dona Ana County detention facility.**

130.    Mr. Bradshaw was not transported to Dona Ana County in an ambulance or a similar vehicle with emergency medical care available. He advised the transport officer of his serious medical condition and asked that officer to call the judge in Dona Ana County to see if the transport could be rescheduled. The transport officer refused to do so and did not even take the wire cutters that medical orders required to be kept with Mr. Bradshaw at all times so that the wires holding his jaw shut could be cut open in case of a medical emergency.

131.    During the trip to the Dona Ana County detention facility, Mr. Bradshaw vomited. Because his mouth was wired tightly shut, and because the transport officers did not bring the wire cutters and did nothing to respond to his serious medical needs, Mr. Bradshaw was forced to swallow portions of his own vomit and blow the rest of it out through his nose to avoid suffocating to death while unattended in the back of the transport vehicle.

132.    The transfer to Dona Ana County was based on Mr. Bradshaw's status as a witness for the prosecution in *State v. Alonso*, No. D-307-CR-2018-00733, *State v. Cardenas*, No. D-307-CR-201800371, and *State v. Flores*, No. D-307-CR-201800372, the murder-for-hire conspiracy cases initiated after Mr. Bradshaw's traffic stop of Mr. Alonso in Chaves County in February 2018, while Mr. Bradshaw was still working as a Chaves County Sheriff's Deputy.

133.    Upon information and belief, inmates at OCPF involved in the extortion racket described above, as well as OCPF staff participating in unlawful activities at the facility, had access to records requesting that other inmates such as Mr. Bradshaw be transported for court appearances.

134.    Mr. Padilla's violent attack on Mr. Bradshaw and Mr. Bradshaw's subsequent transfer from OCPF had an adverse effect on Mr. Bradshaw's ability to testify as a witness for the prosecution in the above-captioned criminal cases. Mr. Bradshaw's mouth was still wired shut

from the surgery following the attack, he was still experiencing serious pain and discomfort from his injuries, and the transfer to CNMCF substantially lengthened the time and difficulty associated with transporting him to the courthouse in Dona Ana County.

135.   The transfer from CNMCF to Dona Ana County also meant that Mr. Bradshaw was not provided with the follow-up care for his injuries that the medical staff at the University Hospital in El Paso had prescribed at the time of his discharge from that hospital on March 4, 2020. The Dona Ana County Detention Facility was not equipped to care for Mr. Bradshaw's serious injuries and medical conditions and did not transport him to his appointment at University Hospital in El Paso on March 12, 2020.

136.   Mr. Bradshaw's condition deteriorated while he was in the Dona Ana County facility. With his mouth still wired tightly shut, he had to subsist on milk and liquid cheese packets that he purchased from the commissary and mixed with water.

137.   The date of Mr. Bradshaw's transfer from CNMCF to the Dona Ana County Detention Center coincides with the date on which the State of New Mexico officially reported its first three residents infected by the COVID-19 virus. The following day, March 13, 2020, the Governor of New Mexico closed public schools statewide while Mr. Bradshaw continued to suffer without adequate medical care in the Dona Ana County detention facility.

138.   At the March 2020 docket calls in *State v. Alonso*, No. D-307-CR-2018-00733, and *State v. Cardenas*, No. D-307-CR-2018000371, and *State v. Flores*, No. D-307-CR-2018000372, the trials in those cases were continued to a subsequent date. Mr. Bradshaw remained on the State's trial witness lists for the rescheduled trial settings.

139.   On or about March 18, 2020, while the general public was directed not to travel based on the emerging COVID-19 pandemic, Mr. Padilla was transported from the Dona Ana County detention facility back to CNMCF, again without adequate follow-up care for his injuries

and contrary to the discharge instructions provided by the medical staff at University Hospital in El Paso. When Mr. Bradshaw informed the transport officer that he was on a liquid diet due to his mouth being wired shut, the transport officer suggested that Mr. Bradshaw give his sack lunch to the other inmate being transported in the back of the same vehicle at the time. Thus, Mr. Bradshaw went hungry during the transport back to CNMCF.

140.    As a diabetic, Mr. Bradshaw faced a heightened risk of infection, with respect to both the COVID-19 virus and the wounds from his injuries and surgeries. Defendant NMCD and its staff failed to take precautions against the spread of the COVID-19 virus with respect to Mr. Bradshaw and other inmates at CNMCF, while at the same time other state officials were directing such precautions for schools, courthouses, employers, and the general public.

### 3.    Mr. Bradshaw's disciplinary hearing at CNMCF.

141.    Despite the fact that Mr. Bradshaw's mouth was still wired shut and he was still suffering from the acute effects of the attack and ensuing surgery, NMCD officials required him to appear for a disciplinary hearing on the false charge of fighting with another inmate that corrections officers at OCPF had filed with Defendant Martinez's approval on March 1, 2020.

142.    At the disciplinary hearing before an NMCD hearing officer at CNMCF on March 23, 2020, Mr. Bradshaw explained to the hearing officer that he had not had a chance to review or even determine whether he had received all disciplinary material related to the hearing because of his medical conditions and the transfers which had occurred since the date of the incident. Although he was barely able to talk with his mouth swollen, infected, and still wired shut, Mr. Bradshaw attempted to tell the hearing officer what happened during the attack and how it related to the extortion racket that inmates were running at OCPF with the participation of the correctional staff there.

143.    The hearing officer declined to consider Mr. Bradshaw's account of the extortion racket at OCPF but said he would request video recordings of the alleged "fight" with Mr. Padilla, which were not included in the disciplinary materials in the record at the time of the hearing on March 23, 2020. The hearing officer abruptly ended the disciplinary hearing after only a few minutes, and Mr. Bradshaw was returned to his cell at CNMCF.

144.    After reviewing a video recording of the incident, the NMCD hearing officer issued a decision to dismiss the false charge of fighting which corrections staff at OCPF had made against Mr. Bradshaw. As the basis for this decision, the NMCD hearing officer provided the following account of the video footage he reviewed:

> On 3/24/2020 I reviewed the video footage of the [alleged] fight between inmate Bradshaw and inmate Padilla. Inmate Padilla walks from the barber's chair to inmate Bradshaw and proceeds to push him back, then inmate Bradshaw pushes through inmate Padilla to get out of the confined area of his bunk and the surrounding bunks. They then exchange some words and inmate Bradshaw then returns to his bunk area where inmate Padilla and Bradshaw exchanges some more words (*sic*). Inmate Padilla then turns around and starts beating on inmate Bradshaw. Not once in the video did inmate Bradshaw throw a punch. Inmate Bradshaw was in his bunk area when all this occurred and he continued to stay in his bunk area.

145.    While NMCD had staff and resources available to arrange for Mr. Bradshaw's transfer to Dona Ana County, conduct his disciplinary hearing on March 23, 2020, obtain video footage from OCPF, and render a decision dismissing all charges the next day, NMCD chose not to provide staff and resources to transport Mr. Bradshaw to his follow-up medical appointment at University Hospital in El Paso or to provide adequate medical care for his serious medical needs upon his return to CNMCF. Mr. Bradshaw was still left in a deteriorating medical condition with his jaw wired shut and no follow-up appointment regarding the surgery he had received on March 2, 2020.

**4.    Delays in getting Mr. Bradshaw to off-site appointments with specialists for necessary follow-up care for his serious medical needs.**

146.    Records produced by NMCD show that on March 25, 2020, health care staff at CNMCF stated a concern regarding an infection on the left side of Mr. Bradshaw's jaw, which was in a painful, abnormal position due to being wired shut. Records produced by NMCD indicate that health care providers at CNMCF were again made aware of Mr. Bradshaw's serious medical needs, including his facial swelling, on March 27, 2020.

147.    Records produced by NMCD show that on April 1, 2020, Mr. Bradshaw's jaw was still wired shut, and health care staff at CNMCF were aware of the need to get him a follow-up appointment to get his jaw "un-wired."

148.    Records produced by NMCD show that by April 6, 2020, health care staff at CNMCF wrote an order for Mr. Bradshaw to receive "Boost" beverages, because he had lost 30 pounds while his food intake was restricted from his jaw being wired shut and the liquid diet he had been prescribed for over a month.

149.    Records produced by NMCD indicate that it was not until April 20, 2020 – 50 days after his emergency medical treatment at University Hospital in El Paso - that Mr. Bradshaw was finally given an off-site appointment with a provider to diagnose what was wrong with his jaw.

150.    Records produced by NMCD indicate that on April 20, 2020, Dr. Wheaton of Santa Fe Oral Surgeons opined that Mr. Bradshaw needed a plate on the right side of his jaw redone and noted pus with an infection of the mandible. These records indicate that Dr. Wheaton removed one arch bar, left the other arch bar in place, and removed some vertical wires to allow Mr. Bradshaw to open his mouth for the first time since the attack on March 1, 2020. He was placed back on a non-liquid diet on April 24, 2020.

151.    According to Dr. Wheaton's records, Mr. Bradshaw needed to be seen by a specialist at a facility with better imaging. Dr. Wheaton noted: "Pt. to see Dr. Rose/UNM ASAP!"

Staff at CNMCF received these records from Dr. Wheaton's office and noted on April 24, 2020, that Mr. Bradshaw had received an offsite referral to UNMH Dr. Rose for an office visit and surgical procedure.

152.    Records produced by NMCD indicate that Mr. Bradshaw was not taken to his first offsite referral appointment at UNMH in Albuquerque until April 28, 2020. The records of that first UNMH appointment document that Mr. Bradshaw was "lost to follow-up" at University Hospital in El Paso and needed advanced imaging, including "CT maxillofacial with 3D reconstruction." The UNMH records state that Mr. Bradshaw had lost 29 pounds since his first operation at University Hospital in El Paso on March 2, 2020.

153.    Records produced by NMCD indicate that Mr. Bradshaw returned for a second offsite visit to UNMH on or about May 5, 2020. Records from that visit state that Mr. Bradshaw was still experiencing "pain left side with edema and right side malocclusion."

154.    Records produced by NMCD indicate that a surgical specialist at UNMH told Mr. Bradshaw that he needed "revision operative fixation" of the fractures in his jaw, but that it would be better to wait until six months had passed since the original surgery on March 2, 2020, so that his mandible would be more stable and better to work with. While noting that Mr. Bradshaw's mandible remained "grossly displaced lingually," records indicate that the UNMH specialist recommended postponing further surgery until August 2020, with a pre-op visit in July 2020.

**5.    Mr. Bradshaw's efforts to prevent his return to OCPF during the height of the COVID-19 outbreak at that facility.**

155.    With no prospect of a timely remedy for his broken jaw or the serious medical needs that followed from it, Mr. Bradshaw became increasingly concerned that he would be transferred from CNMCF back to OCPF to face the same dangerous conditions that he previously experienced

there, as well as increased danger of infection from the COVID-19 virus, which was rapidly spreading during that period.

156.    Records produced by NMCD indicate that Mr. Bradshaw received a test for the COVID-19 virus on May 8, 2020. Progress notes for May 15, 2020, indicate that he was still experiencing pain and swelling in his jaw.

157.    May 15, 2020, was also the date on which the first case of COVID-19 infection was reported at OCPF. Due to the conditions at OCPF described above and Defendants' failure to operate or maintain that facility in a safe and professional manner, the first COVID-19 case at OCPF exploded to over 400 cases in a little over a month.

158.    On or about May 21, 2020, counsel for Mr. Bradshaw provided written notice of Mr. Bradshaw's claims to Defendants Martinez, MTC, Lucero, NMCD, and Otero County. That notice also requested that each of these Defendants preserve all records regarding those claims, as well as Mr. Bradshaw's medical and inmate files, which neither Mr. Bradshaw nor his counsel could access at that time.

159.    On or about June 19, 2020, counsel for Mr. Bradshaw sent a letter to Defendants Martinez, MTC, NMCD, and Lucero requesting that Mr. Bradshaw remain at CNMCF – and not be returned to OCPF – due to the grave security and health concerns that would result if he were returned to OCPF under the circumstances described above. That letter also explained to those Defendants how Mr. Padilla's violent attack on Mr. Bradshaw is connected to a larger retributive conspiracy involving a group of inmates involved in illicit activities at OCPF.

160.    Meanwhile, progress notes for May and June 2020 produced by NMCD indicate that Mr. Bradshaw was still experiencing persistent pain and tenderness on his jaw and had not received any further follow up or appointments for oral surgery. Yet staff at CNMCF were still

raising questions about when Mr. Bradshaw could be discharged from the Long-Term Care Unit at CNMCF and transferred to another facility.

161.    While still in NMCD's custody, Mr. Bradshaw did not receive the "revision operative fixation" of the fractures in his jaw that the UNMH specialist had recommended he receive in August 2020. He did not even receive a follow-up appointment with the UNMH surgical specialists who had recommended that operation after he was referred there "ASAP" by Dr. Wheaton months earlier.

162.    Instead, records produced by NMCD indicate that on August 14, 2020, Mr. Bradshaw was taken to see a "Dr. Tuggle" at "Sandia Oral" -- an entirely different provider at a dental office in Albuquerque. Dr. Tuggle's records indicate that he declined to see Mr. Bradshaw or perform the scheduled revision operation on that occasion, because the previous surgery was done by another ENT physician, and Dr. Tuggle did not want to take over.

163.    Contrary to Dr. Tuggle's own opinion, as well as the earlier medical advice provided by Dr. Wheaton and the surgical specialist at UNMH, records produced by NMCD indicate that Mr. Bradshaw was taken back to Dr. Tuggle's dental office at Sandia Oral on August 24, 2020. Operating from a dentist's chair rather than a hospital setting, and without an ambulance standing by or proper hospital attire, records indicate that Dr. Tuggle removed some hardware from Mr. Bradshaw's infected left and right mandibles and wired his mouth shut again.

164.    Mr. Bradshaw woke up after the operation to find that his shirt was soaked with blood and he was bleeding all over the back of the transport van in which he was being taken back to CNMCF. Upon his arrival there, he was in such medical distress that he needed help with basic functions such as going to the restroom.

165.    A progress note produced by NMCD and dated August 25, 2020, notes that Mr. Bradshaw's left jaw was deformed and skin appeared tense and very swollen due to recurring

infections in that area. He was on a liquid diet again and was reportedly taking four Boost supplemental beverages per day to prevent or reduce further weight loss occasioned by having his mouth wired shut for the second time.

> **6.     Mr. Bradshaw's second transfer to and from the Dona Ana County detention facility during the COVID-19 pandemic.**

166.    Records produced by NMCD indicate that Mr. Bradshaw was scheduled to return to Dr. Tuggle's office again a week after the operation described above to take out his stitches and receive follow-up care. Instead of receiving that follow-up appointment – and notwithstanding his serious medical conditions and the escalating COVID-19 pandemic entering its second wave -- Mr. Bradshaw was again transported from CNMCF to the Dona Ana County detention facility so he could appear as a trial witness for the prosecution in *State v. Alonso*, No. D-307-CR-2018-00733, *State v. Cardenas*, No. D-307-CR-2018000371, and/or *State v. Flores*, No. D-307-CR-201800372. Those cases had docket calls scheduled in September 2020.

167.    Again Mr. Padilla's violent attack on Mr. Bradshaw and Mr. Bradshaw's subsequent transfer from OCPF had an adverse effect on Mr. Bradshaw's ability to testify as a witness for the prosecution in the above-captioned criminal cases. Mr. Bradshaw's mouth was still wired shut from the bloody operation performed in Dr. Tuggle's dentist chair, Mr. Bradshaw was still experiencing serious pain and discomfort from his injuries and ensuing surgeries, and the transfer to CNMCF substantially lengthened the time and difficulty associated with transporting him to the courthouse in Dona Ana County.

168.    At the September 2020 docket calls in the above-captioned criminal cases, the trials were again continued to a subsequent date. Mr. Bradshaw was never even taken to the Dona Ana County courthouse, much less called to testify on that occasion.

169.     Mr. Bradshaw was transported from the Dona Ana County detention facility back to CNMCF following the September 2020 docket calls. He remained on the State's trial witness lists for the rescheduled trial settings after that date.

**7.     Continued neglect of Mr. Bradshaw's serious medical needs for the remainder of his incarceration at CNMCF and delays in his parole.**

170.     It took several weeks before Mr. Bradshaw was returned to Dr. Tuggle's office for follow-up care regarding the operation performed before the second trip to Dona Ana County described above. Eventually, Dr. Tuggle removed the wires that held Mr. Bradshaw's mouth shut until the time of that follow-up visit. Although Mr. Bradshaw was still suffering from the effects of Mr. Padilla's violent attack, as well as the ensuing surgeries and lack of timely follow-up care, he was told that there was nothing more Dr. Tuggle could do for him at that point.

171.     The health care provider at CNMCF knew that Mr. Bradshaw was still in need of further surgery and medical treatment for his broken jaw and related injuries after his last visit with Dr. Tuggle. But rather than provide him with timely and necessary medical care or arrange for him to be medically paroled so he could obtain such care for himself, the provider at CNMCF advised Mr. Bradshaw to simply postpone that care until after his release date.

172.     Mr. Bradshaw remained in Defendant NMCD's custody at CNMCF under the conditions described above until his release date after Christmas at the end of December 2020, when he was finally placed on parole. While in state custody, he never received the revision surgery recommended by the specialists at UNMH or adequate follow-up care for the injuries he sustained during Mr. Padilla's violent attack.

173.     While New Mexico Governor Michelle Lujan-Grisham claimed to have initiated a program for early release of medically vulnerable inmates during the public health emergency she

declared during the COVID-19 pandemic, Mr. Bradshaw never received the benefit of that program.

174.    Following his release from CNMCF at the end of December 2020, Mr. Bradshaw was still in need of extensive medical care for the injuries he sustained while in state custody, and he had lesions growing on the side of his face from the infected tissue in his jaw. Mr. Bradshaw returned to the same surgical specialist at UNMH that he was supposed to have seen many months earlier in August 2020. At that point, Mr. Bradshaw was told that he had no joint left on the right side of his jaw, and he could only open his mouth about 15 millimeters, which was not wide enough for a dentist to enter for purposes of extracting a tooth that had been damaged as a result of Mr. Padilla's violent attack.

175.    Mr. Bradshaw subsequently underwent lengthy surgery at UNMH to install a prosthetic jaw joint and to surgically extract the damaged tooth that could not be reached through his mouth. The surgery also involved an incision running the length of Mr. Bradshaw's face, an additional incision to extract fat from his belly and place it around the newly installed prosthetic jaw joint, and the drilling of eight screws in his mouth, which were used to secure fasteners that kept his mouth shut after the surgery.

176.    After that round of surgery, the right side of Mr. Bradshaw's face became severely swollen. After the swelling receded, Mr. Bradshaw lost the function of three nerves on the right side of his face. As a result, he can no longer close his right eyelid, which in turn causes tears to flow from that eye uncontrollably. Additionally, the right side of Mr. Bradshaw's face and mouth are disfigured in a drooping position that impairs his ability to speak, form facial expressions, and sleep. The condition described above has persisted for several weeks and is not expected to change absent further surgical intervention.

177.    Mr. Bradshaw is currently awaiting scheduling for another lengthy round of surgery, during which a surgical specialist will implant a weight in his eyelid to allow it to close and attempt to repair nerve damage to his face. It is unknown whether that surgery will succeed.

178.    Even if the surgery to repair the nerve damage in Mr. Bradshaw's face is a success, he will still require extensive dental work, including braces. He has chipped teeth which may require repair as well. The prosthetic jaw joint that was installed recently will eventually require replacement in approximately 10-15 years.

179.    Mr. Bradshaw also remains on parole and will be required to serve a period of probation after he completes his parole term. While NMCD's General Counsel represented that Mr. Bradshaw would not be returned to OCPF during his period of confinement ending in December 2020, Defendant NMCD made no such guarantees with respect to any subsequent period of confinement in the event that Mr. Bradshaw is charged with violating conditions of his probation or parole. Accordingly, Mr. Bradshaw still remains subject to threats of retaliation as of the date this Complaint is filed.

180.    Court records indicate that Mr. Bradshaw also remains on the State's witness list for trial in Dona Ana County in *State v. Cardenas*, No. D-307-CR-2018000371 and *State v. Flores*, No. D-307-CR-201800372, which are respectively set for trial in March and April 2022 as of the date this Complaint is filed. Without regard to the severity of his medical conditions or the necessity of further surgery and medical appointments, Mr. Bradshaw is threatened with a parole violation which could send him back to OCPF should he fail to appear in response to a subpoena for his testimony at the Dona Ana County trials.

181.    Upon information and belief, neither Mr. Padilla nor any of his co-conspirators at OCPF were ever charged in the attack on Mr. Bradshaw or any related extortionate activity, and Mr. Padilla has been released from custody by Defendant NMCD as of the date of this Complaint.

182.    The wrongful acts and omissions of Defendants described above, which resulted in the violent attack on Mr. Bradshaw and the denial of necessary health care for his serious medical needs, are so arbitrary, capricious, abhorrent, and morally repugnant as to shock the conscience of any reasonably civilized human being.

**D.    Other unlawful activities at OCPF evincing policies, customs, and practices that cause constitutional violations at the facility to occur and recur.**

183.    Mr. Bradshaw is not the first or only person to report or suffer the effects of significant unlawful activities occurring among inmates and staff at OCPF. Such activities have been going on for years, and Defendants knew they were recurring on an ongoing basis. Such activities include, but are not limited to, those described below.

**1.    Defendant MTC's Failure to Train and Supervise Staff at OCPF.**

184.    On or about December 31, 2014, Victor Trujillo sought medical treatment from MTC staff at OCPF as a result of injuries to his hand that he sustained in a physical conflict with another inmate there. Although an x-ray later revealed that the fourth metacarpal bone in Mr. Trujillo's hand was broken during the incident, staff at OCPF failed to properly diagnose and treat his injuries for months despite obvious pain and swelling in his hand. Mr. Trujillo ultimately required surgery which could have been avoided had he received timely and adequate medical treatment at OCPF, resulting in disfigurement and loss of function in his hand and finger.

185.    Mr. Trujillo subsequently filed suit against Defendant MTC, to which the company responded by filing a motion for summary judgment. The Honorable William P. Johnson, United States District Judge, denied that motion in a memorandum opinion and order filed April 15, 2016. Judge Johnson concluded not only that Mr. Trujillo presented sufficient evidence to support a claim that MTC employees were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, but also that: "The facts in this case could suggest to a reasonable juror

that MTC failed to adequately train its staff." *Trujillo v. MTC*, No. 15-cv-00544 WJ-SMV, 2016 WL 10538651, at *8 (D.N.M. Apr. 15, 2016). The *Trujillo* case subsequently settled.

### 2.    Federal Prosecution of Drug Trafficking Conspiracies at OCPF.

186.    On April 30, 2014, the United States Attorney's Office for the District of New Mexico announced that Luis Delgadillo, a corrections officer employed by Defendant MTC at OCPF, was charged in a conspiracy to violate federal narcotics laws by smuggling heroin into the facility. Three OCPF inmates were also charged in the conspiracy. Officer Delgadillo and his co-conspirators later pleaded guilty to these charges and were sent to federal prison.

187.    The transactions and illegal activity involved in Officer Delgadillo's drug smuggling operation were recorded on surveillance video and in telephone calls at the facility. Video footage dated March 15, 2014, showed Officer Delgadillo enter a restroom at OCPF for approximately one minute, then exit the restroom holding a white package, which he handed to an inmate shortly thereafter. The inmate took the white package to his bunk area, while another inmate involved in the conspiracy followed him there. A few days later, the second inmate was found in possession of heroin and tested positive for opiates.

188.    During an interview with investigators, Officer Delgadillo admitted that he had smuggled heroin into the OCPF on three prior occasions, and that he was paid $1,000 on each occasion. He explained that he did it for money because he was behind on his house payment and has other loans.

### 3.    Defendant MTC's Labor Law Violations at OCPF.

189.    Mr. Delgadillo is not the first or only correctional officer at OCPF who had financial problems while working at the facility.

190.    In 2016, a group of over one hundred MTC employees who worked at OCPF brought a federal lawsuit claiming the company failed to pay them for activities that constitute

compensable work under the Fair Labor Standards Act (FLSA). The employees claimed that Defendant MTC only paid them for the eight hours during which they were assigned to a standard shift at the facility, rather than the actual greater amount of time recorded when they punched in and out of the company's time clock each shift. The employees also claimed that Defendant MTC used a "ten-minute adjustment rule" which routinely rounds down their work time, resulting in systematic underpayment.

191.    In a published opinion filed February 4, 2020, the United States Court of Appeals for the Tenth Circuit agreed with the employees that Defendant MTC was systematically underpaying them in violation of the FLSA, both with respect to using shift time instead of clock time to compute their compensable hours, and with respect to the downward rounding of ten-minute adjustments. *See Aguilar v. Management & Training Corp.*, 948 F.3d 1270 (10th Cir. 2020).

192.    Defendant MTC's systematic underpayment of corrections officers at OCPF is a significant component of the company's employment policies, customs, and practices, which require undercompensated and understaffed groups of corrections officers to work in substandard facilities which are overcrowded with inmates. That work environment is a recipe for the types of constitutional violations further described below.

**4.      Violation of New Mexico Open Records Laws at OCPF.**

193.    In a published opinion dated September 16, 2019, the New Mexico Court of Appeals held that New Mexico's Inspection of Public Records Act (IPRA) requires a private company which contracted with the State of New Mexico to perform the public function of providing medical care to inmates in state custody to produce records regarding settlement agreements resulting from claims for inadequate medical care provided under those contracts. "Information about the mistreatment and abuse of New Mexico inmates as raised in the civil claims is exactly the type of public information that IPRA contemplates must be disclosed to the public

in order to hold its government accountable," the Court concluded, and "there is no distinction between Respondent and a public entity concerning the issues here." *N.M. Found. for Open Gov't v. Corizon Health*, 2020-NMCA-014, ¶ 21, 460 P.3d 43, *cert denied*, No. S-1-SC-37951 (Dec. 16, 2019).

194.    On or about February 6, 2020, the Human Rights Defense Center (HRDC) sent a written IPRA request to Defendant MTC seeking all records of litigation against MTC and/or its employees or agents where MTC and/or its insurers paid $1,000 or more to resolve claims against it arising from confinement facilities which the company operates under contract within the State of New Mexico.

195.    On or about February 24, 2020, Defendant MTC's counsel sent a form letter denying HRDC's IPRA request and falsely stating that MTC was not a public entity subject to IPRA, was not required to designate a records custodian pursuant to IPRA, and considered the matter closed. In defiance of New Mexico precedent directly on point, Defendant MTC did not produce any of the requested records in response to HRDC's request.

196.    On or about February 27, 2020, HRDC sent a written IPRA request to Defendant NMCD seeking the same records it had requested from Defendant MTC on February 6, 2020, for facilities that Defendant MTC operated under contract with the State of New Mexico.

197.    On or about March 18, 2020, Defendant NMCD sent an email message denying HRDC's IPRA request and erroneously stating that since the HRDC had requested the records from Defendant MTC and Defendant MTC responded, Defendant NMCD had no records to provide and was therefore closing the matter.

198.    Private prison contractors' record of non-compliance with IPRA was so bad that in 2019, the State of New Mexico enacted a new statutory requirement that private correctional facilities shall submit to the board of county commissioners in which their facilities are located

and to the Legislature a report of all monetary settlements that were paid to inmates, former inmates, or inmates' estates as a result of lawsuits filed by such individuals. *See* NMSA, 1978, Section 33-16-6.

199.    On or about June 11, 2020, counsel for Mr. Bradshaw sent a written request to Defendants MTC and Martinez requesting a complete set of files regarding Mr. Bradshaw's incarceration at OCPF. This request enclosed Mr. Bradshaw's own signed releases for those records and also invoked IPRA as additional grounds for releasing the records.

200.    On or about June 15, 2020, counsel for Defendant MTC sent a form letter denying Mr. Bradshaw's request for the records in his own files using the same language the company had used in denying HRDC's IPRA request several months earlier: MTC again falsely claimed that it was not a public entity and was not required to designate a records custodian under IPRA. MTC's form letter gave no explanation why it could not produce Mr. Bradshaw's own inmate records to him pursuant to the release he provided. Again the company defied recent precedent from the New Mexico Court of Appeals that is directly on point.

201.    In response to discovery requests in the *Trujillo* litigation referenced above, Defendant MTC refused to produce video surveillance footage of the incident that gave rise to Mr. Trujillo's injuries, falsely claiming that all video footage at the facility was confidential. *See Trujillo v. MTC et al.*, No. 15-cv-00544 WJ-SMV, Doc. 65 (D.N.M. Opposed Motion for Confidentiality Agreement filed June 13, 2016). Defendant Martinez submitted an affidavit in support of this false claim. *Id.* (Ex. 3 to Doc. 65). The Court required MTC's counsel to produce the video footage for purposes of a settlement conference, and MTC's motion was denied as moot after the case settled. *Id.* (Doc. 70).

202.    On or about June 19, 2020, counsel for Mr. Bradshaw submitted a request for records regarding Mr. Bradshaw's conditions of confinement at OCPF to Defendant NMCD and

included signed releases from Mr. Bradshaw with that request in an effort to preserve and obtain the records which Defendants Martinez and MTC refused to provide, and which were subject to tampering or destruction due to the access that inmates and OCPF staff involved in the extortion racket at OCPF had to those records. In that same request, Mr. Bradshaw's counsel also requested NMCD's records regarding Mr. Bradshaw's conditions of confinement at CNMCF.

203.    Defendant NMCD responded to Mr. Bradshaw's request by providing portions of the requested records in July 2020; however, upon review of the records produced it became apparent that several records germane to this lawsuit were missing. For example, the records produced by Defendant NMCD in July 2020 did not include the hearing officer's disciplinary decision dismissing the charge that Mr. Bradshaw engaged in fighting during Mr. Padilla's violent attack on him on March 1, 2020. NMCD's hearing officer at CNMCF, in turn, had to request the video footage of Mr. Padilla's attack on Mr. Bradshaw, because staff at OCPF had not provided that footage to the hearing officer at CNMCF at the time of Mr. Bradshaw's disciplinary hearing.

204.    As of the date of this Complaint, Defendants Martinez and MTC have not provided any records at all in response to the records requests submitted by Mr. Bradshaw's counsel. Upon information and belief, inmates and OCPF staff involved in the extortion racket and other unlawful activities at the facility may have destroyed or altered some of the records responsive to that request.

205.    Due to Defendant MTC's official policy, practice, and custom of defying New Mexico precedent holding that records of prison contractors performing public functions with respect to inmates in state custody are public records subject to IPRA, Mr. Bradshaw is unable to present a complete record of the company's mismanagement and unlawful activities at OCPF at the time this Complaint is filed and will require formal discovery under the Federal Rules of Civil Procedure to advance his claims.

**E.**     **Longstanding corporate policies, practices, and customs of Defendant**
           **MTC that cause constitutional violations to occur and recur.**

206.    Defendant MTC's corporate policies, practices, and customs which caused the

constitutional rights of Mr. Bradshaw and other inmates to be violated are longstanding, systemic,

and not limited to the facts described above. They have been in place for years, and Defendants

knew about them. Examples of these systemic constitutional violations include, but are not limited

to, those described below.

**1.**     **The 2003 DOJ Report on Santa Fe County's Adult Detention Center.**

207.    At the time Defendant NMCD contracted with Otero County to house inmates at

OCPF and Defendant Otero County contracted with Defendant MTC to operate and manage that

facility, Defendant MTC was already the subject of adverse findings resulting from an

investigation conducted by the Civil Rights Division of the United States Department of Justice

(DOJ) at the Santa Fe County Adult Detention Center (SFCADC), which Defendant MTC had a

contract to manage and operate from 2001 to 2005.

208.    In its 2003 report regarding MTC's operation and management of SFCADC, DOJ

made several specific findings regarding MTC's failure to protect inmates from harm and failure

to provide inmates with opportunities to redress grievances. DOJ found that the conditions in the

booking area at SFCADC were a cause of unrest, conflict, and violence among the inmate

population housed there.

209.    These conditions included overcrowding large numbers of inmates with mixed

classifications and special statuses into the shared common space of a confined booking area that

was understaffed and lacked adequate surveillance or a sufficient command presence by properly

trained and supervised detention officers. The result was several reported instances where inmates

got into disputes which turned violent. Indeed, DOJ described the mixing of sometimes agitated

or intoxicated inmates with the rest of the newly arrived inmates in the facility as "a recipe for conflict."

210.    For example, the DOJ report described an incident where two inmates at SFCADC were forcing others to move from where they were sleeping to give them their preferred spaces. A fight broke out, and an inmate who refused to move from the spot where he had been sleeping sustained injuries.

211.    The DOJ report on SFCADC also found that the grievance system at the facility was not providing inmates with a meaningful path for redress of inmate complaints. For example, DOJ found that the grievance system at SFCADC required inmates to attempt to resolve problems by confronting staff before filing a grievance, and that the power differences among inmates and staff made it difficult for inmates to pursue a grievance in the first place. Additionally, there were no grievance forms available in some units, and inmates who made it far enough through the process to actually file a grievance faced numerous procedural obstacles, including a failure by the facility's grievance coordinator to document its actions in response to such grievances.

212.    The absence of a meaningful and effective grievance process also contributed to inmate unrest and conflict at SFCADC. Combined with the unsafe conditions noted in the facility's booking area, that absence left inmates to rely on unlawful self-help measures or the ability to physically dominate other inmates as a means of attempting to resolve disputes and discontent within the facility.

213.    In addition to the problems noted in the DOJ report, MTC was a defendant in a civil-rights lawsuit arising from an incident in 2004 where SFCADC inmate Dickie Ortega was beaten to death by other inmates after facility staff placed him in a pod known to be under gang control and after Ortega had previously been beaten in the same facility. That lawsuit ended in a

court-approved confidential settlement with MTC. *See Martinez v. Management & Training Corp.*, No. 06cv567 RB-ACT, Doc. 53 (D.N.M. May 7, 2007).

214.    The findings in the DOJ report regarding Defendant MTC's failure to protect inmates from harm or effectively redress grievances at SFCADC in 2003, as well as the facts raised in the lawsuit over Mr. Ortega's death at that facility in 2004, foreshadow many of the same failures that Mr. Bradshaw later experienced in the Unit S2 dormitory at OCPF in 2020. Those failures arise from many of the same underlying company policies, practices, and customs.

215.    In April 2005, MTC's Vice President, Al Murphy, told the *Albuquerque Journal* that "low inmate occupancy numbers and the costs of additional operating requirements have made it impossible for MTC to continue to manage the" SFCADC. Defendant MTC terminated its contract to operate and manage SFCADC for Santa Fe County after the DOJ report on SFCADC was issued because the company did not consider continued operation of that facility to be profitable enough with the reforms recommended by the DOJ report in place.

## 2.    Defendant MTC's Mistreatment of Immigrants and Foreign Detainees.

216.    Instead, the same regional and national management personnel at MTC moved their contracting activities to other, more profitable facilities such as OCPF, which opened after the DOJ report on SFCADC was issued, but was not subject to DOJ oversight. These regional and national management personnel brought with them the same business model with the same dangerous and ineffective corporate policies, practices, and customs which caused inmates' constitutional rights to be violated.

217.    Defendant MTC's Director of Corrections Business Development at the time the company obtained its contract with Santa Fe County in 2001 was Ryan McCotter. Mr. McCotter was also a former Secretary of NMCD.

218.     Shortly after the DOJ report regarding civil rights violations at SFCADC was issued in March 2003, Mr. McCotter was retained to go to Abu Ghraib prison for the purpose of reconstructing prison systems Iraq and training prison staff there. What followed was the infamous Abu Ghraib prison scandal, which resulted in systematic and illegal abuse of detainees at that facility later that year.

219.     While many media reports on the Abu Ghraib scandal in 2004 focused on torture of inmates by individual soldiers or contractor personnel, the United States Army's investigation report written by Major General Antonio M. Taguba also documented systemic problems with the Abu Ghraib prison which were common at correctional facilities run by Defendant MTC and other private contractors: Abu Ghraib prison was both overcrowded and understaffed, with a lack of proper screening or classification so that Iraqis who posed no threat were housed alongside dangerous inmates. Additionally, Major General Taguba's report found that the personnel operating the prison were poorly prepared and untrained.

220.     Seeking to profit from new business opportunities arising from federal immigration policies during the post 9/11-era, Defendant MTC obtained a contract to operate and manage the Otero County Processing Center (OCPC) after it was constructed next to OCPF in June 2008. OCPC housed immigration detainees under a series of agreements among ICE, Defendant Otero County, and Defendant MTC.

221.     Under Defendant MTC's management, the OCPC soon began to accumulate a record of causing the same types of constitutional violations which had occurred at other facilities the company operated. As documented an investigative report published by the ACLU in January 2011 and a series of reports by government inspectors, individuals detained at OPCC during its first few years of operation experienced problems with visitation, communication, and mail service; lack of meaningful grievance procedures and access to counsel; reliance on commissary

purchases to fulfill basic nutritional, sanitary, and personal hygiene needs, which gave rise to theft among detainees; lack of appropriate medical diets for detainees with diabetes or other chronic medical conditions; abuse, retaliation, and other unprofessional behavior by poorly trained detention officers and staff; and allowing gangs or other dominant detainee groups to set their own rules for their pod, resulting in discrimination and abuse of other detainees in the pod.

222.    The findings in ICE's own inspection reports regarding OCPC were compiled in a 2018 report published by immigrants' rights groups, which documented a ten-year history of unhealthy conditions, abuse and exploitation, social isolation, mental anguish, and barriers to justice and legal access among the detainee population at OCPC.

**3.    Unlawful activities at MTC-run detention facilities in Texas**.

223.    The MTC-run Willacy County Correctional Center (WCCC) in Willacy County, Texas was funded and built using a scheme similar to that used for the facilities the company operates in Otero County, New Mexico. Willacy County issued bonds to pay for the WCCC's construction. Then the County contracted with the federal government to house federal detainees at the facility and used the revenue from that federal contract to pay back investors for the bonds and to hire Defendant MTC to run the facility for them.

224.    There was a riot at WCCC on February 21, 2015. At that time, MTC was housing nearly 2,000 inmates there. WCCC was a "tent prison" in which inmates were housed in large oval-shaped Kevlar dome structures divided into four open dormitory-style pods each housing 50 inmates. These structures were set on fire during the riot, rendering much of the facility uninhabitable.

225.    Before the February 2015 riot, there had been a pattern of assaults, drug trafficking, and other unlawful activities at WCCC similar to that described in reference to other MTC-run facilities. In November 2007, for example, four MTC employees assigned to work at WCCC were

charged with using their company vehicles to smuggle 28 undocumented immigrants through the United States Border Patrol's checkpoint in Sarita, Texas. On November 10, 2010, an MTC detention officer at WCCC was arrested on charges of conspiring to possess with intent to distribute cocaine in the facility.

226.    An October 2011 PBS Frontline investigation reported numerous instances where detainees at WCCC were sexually and physically assaulted by MTC employees. The Frontline television broadcast quoted a former transportation guard at WCCC who said she saw surveillance video of four MTC employees beating up a detainee. The former guard said she was told to clean up the statements of the guards and make them consistent to hide evidence. The next morning, the beaten detainee was shipped out of the facility and deported.

227.    After the February 2015 riot, Standard and Poors downgraded the bonds that Willacy County used to build WCCC to "junk" status. The county's bond debt balance was $128 million, with bond debt of about $8 million per year.

228.    Willacy County then filed a federal lawsuit against MTC in December 2016 for "abysmal mismanagement." The next year, after President Trump took office, Defendant MTC responded to the lawsuit by agreeing to buy the remains of the burnt-out Texas facility from the county for $68 million (the amount then owed on the county's bonds). Texas County Judge Aurelio Guerra was quoted as saying that President Trump's push to deport immigrants living in the U.S. illegally and convicted of crimes helped lead to the deal.

229.    In 2017, the Honorable Andrew Hanen, United States District Judge, sentenced two Willacy County prison guards (Stephan Salinas and Harry Cordero) to 18 months in federal prison for bribery involving the smuggling of cell phones and alcohol to inmates in MTC's Willacy prison facility between October 2015 and January 2016.

4.     **Defendant MTC's custom and practice of ceding control**
       **of Arizona prison facilities to prison gang members.**

230.    On July 30, 2010, three inmates escaped from a state prison in Kingman, Arizona, that Defendant MTC had contracted to operate and manage for the Arizona Department of Corrections since 2003. The escapees were able to get past locked doors, avoid surveillance cameras, deter ground and fence sensors, and went unnoticed by guard towers and a ground patrol while they cut a hole in the prison's perimeter fencing.

231.    Arizona's Corrections Director found that even before the 2010 escapes from the Kingman prison, that facility had a history of riots and disturbances dating back to 2005, including thirteen instances of large groups of inmates refusing directives or chasing MTC staff off the yard in the facility.

232.    A female co-conspirator who aided and abetted the 2010 escapes by providing bolt cutters and an escape vehicle to the fugitive inmates was caught trying to smuggle heroin into the Kingman prison a month prior to that escape. Yet she was released and allowed to continue her illegal activities after her smuggling attempt was discovered.

233.    Five days after the July 30, 2010, escape from the Kingman prison, an inspection team from the Arizona Department of Corrections found that Defendant MTC employed new and undertrained staff and rookie supervisors who ignored alarms, left long gaps between perimeter patrols, left doors leading out of some buildings open and unwatched, did not alert the state or local police until hours after the escape, and failed to properly operate and maintain buildings, equipment, machinery, and furnishings at the prison. These failures resulted in a broken alarm system, eight burned-out perimeter lights, and other broken security equipment at the Kingman prison.

234.   A week after the July 30, 2010, escape from the Kingman prison, Defendant MTC's founder and board chairman, Robert L. Marquardt, described it as "the first major glitch we've had, and I pray they pick the two guys up and nobody gets hurt." Not all of Mr. Marquardt's prayers came true, and the Kingman escape was not the company's "first major glitch."

235.   It was reported that two weeks after the July 30, 2010, escape from the Kingman prison, a couple from Oklahoma were murdered in New Mexico by two of the inmates who escaped from that facility. Court records indicate those two inmates were later captured in Arizona and convicted for the murders in the District of New Mexico. *See United States v. John Charles McCluskey and Tracy Province*, No. 10cr2734 JCH (D.N.M. 2010).

236.   The families of the murder victims filed a civil action for wrongful death against Defendant MTC, which the company later settled. *See Cathy Byus v. Management and Training Corp.*, No. CV2011-005377 (Maricopa County Superior Court Mar. 17, 2011).

237.   In a letter dated August 13, 2010, responding to the ADOC's report regarding deficiencies at the Kingman prison which led to the escape, Defendant MTC admitted that: "We are in substantial agreement with the report and are committed both individually and as a Company to make the corrections necessary to provide the level of security expected of all professionals in our business. MTC accepts full responsibility for this escape." But contrary to these misrepresentations about taking corrective action, Defendant MTC's longstanding policies, customs, and practices continued to cause constitutional violations at the Kingman prison and elsewhere.

238.   The *Arizona Republic* reported that the MTC-run Kingman prison facilities had the most reported inmate assaults and fights among the State of Arizona's private prisons every fiscal year from 2010 to 2014. In fiscal year 2014, these MTC-run facilities accounted for 119 of the 161 inmate assaults reported in Arizona's six private prisons.

239.    On January 19, 2015, inmate Neal Early died in a hospital after being fatally assaulted at one of the MTC-run Kingman facilities in Arizona. Mr. Early was serving a sentence for shoplifting DVDs from Walmart, but Defendant MTC housed him in an open dormitory-style unit controlled by dangerous prison gang members. An autopsy showed Mr. Early had a broken cranial bone depressed into his brain. A subsequent search of the dormitory found weapons, illegal cell phones, and heroin. Although suspicious activity among inmates in Mr. Early's unit was captured on surveillance video at the time he was attacked, it went unnoticed by MTC's corrections staff. A guard working a 16-hour shift had been supervising 200 inmates at the time of the attack.

240.    In July 2015, conditions at the MTC-run Kingman prison facilities deteriorated to the point where riots broke out among the inmate populations. The facilities were so badly damaged in the riots and ensuing response to it that the State of Arizona had to transfer all the Kingman inmates to other facilities elsewhere in the state.

241.    In August 2015, Arizona Governor Doug Ducey announced that he was terminating the contract under which Defendant MTC had been running the State's Kingman prison facilities. Governor Ducey based his decision on an Arizona Department of Corrections report resulting from an investigation of the conditions which led to the July 2015 riots.

242.    The ADOC's August 2015 report found that Defendant MTC had "a culture of disorganization, disengagement, and disregard" of ADOC policies. The report also found:

> MTC failed to conduct critical staff training that was required under its state contract, and hid the failures and deficiencies from DOC.

> MTC did not "promptly and effectively quell the riots," allowing them to last longer than they should have and resulting in more damage to facilities.

> Inmates did not direct their anger at each other but at prison staff, and focused the destruction on MTC property, suggesting "that the riots were more likely precipitated by inmate dissatisfaction with MTC's operation of the prison than by anger among the inmates themselves."

64

> More than a third of MTC performance problems identified five years ago [in 2010], when the escape of three inmates resulted in a violent rampage through several states, were again identified in the 2015 investigation.

243.    A 2018 investigative report by journalist Kathy Dobie gave the following description of how prison gangs ran extortion and drug-trafficking rackets at the MTC-run Kingman prison facilities during the period leading up to the 2015 riots: "A 'head' is deputized to run the day-to-day inside each facility. These guys, the alpha males, the big dogs, serve as spokesmen when dealing with the prison administration. They direct all commerce among their group, arbitrate disputes, and mete out justice." Below the "heads" are "boys" who are delegated the task of running individual units or dormitories and "collecting 'rent' – a percentage of drug sales, gambling proceeds and the unofficial commissaries." What made the MTC-run facilities at Kingman stand out from publicly-run prisons was that: "The whole system of illegal enterprise, including unwritten codes of conduct … and savage justice, ran almost unimpeded by the corrections staff."

244.    One of the reasons why prison gangs and other dominant inmate groups were able to effectively run these facilities according to their own rules was MTC's corporate policy, custom, and practice of understaffing them with underpaid and undertrained employees. Research by journalist Craig Harris of the *Arizona Republic* found that Defendant MTC had the second-lowest entry-level salary for correctional officers among Arizona's 10 public and six private prisons in 2015. The State of Arizona withheld $851,372 in payments to MTC during the fiscal year preceding the 2015 riots due to understaffing, which accounted for 78 percent of the understaffing assessments charged to the State's three private prison contractors that year.

245.    An August 2015 report on the Kingman prison riots by the American Friends Service Committee (AFSC) also found numerous deficiencies in staffing and training at MTC-run facilities in Arizona. The report noted that staffing deficiencies were repeatedly cited in ADOC's

assessment of the 2010 escapes from the MTC-run Kingman prison: "The unit is staffed with a very high percentage of new staff and many of them demonstrated a lack of experience and 'command presence.'" The AFSC report also quoted a former MTC staffer who told the *Kingman Daily Miner*: "Employee morale is horrible … since correctional officers are made to work copious amounts of overtime – sometimes 16 and even 20 hours a day – and fatigue … could have played a role in the riots and disturbances. Inmates knew when the guards have been on duty for extended hours. All they have to do is watch."

246.    The 2015 AFSC report concluded that "the combination of low pay, understaffing, and having a 'green' workforce (guards with minimal training and experience) is a recipe for unstable and dangerous prisons. Guards who are new and under trained may not have enough experience to notice when conflicts are brewing or know how to defuse them before they lead to assaults or worse."

**5.    Defendant MTC's Involvement in "Operation Mississippi Hustle."**

247.    In 2013, the ACLU and Southern Poverty Law Center brought a class-action lawsuit on behalf of inmates at East Mississippi Correctional Facility (EMCF) seeking injunctive relief against Defendant MTC and the Mississippi Department of Corrections (MDOC) based on a pattern of constitutional violations at that facility over the course of several years.

248.    Evidence developed and presented during the EMCF inmates' class-action lawsuit showed that chronic understaffing at the facility exposed those inmates to the same types of risks documented above with respect to MTC-run facilities in New Mexico, Texas, and Arizona. Without a sufficient number of adequately trained and compensated staff, prison gangs assumed control of EMCF, making housing decisions, controlling access to food and showers, and working in special housing units against written MDOC policy. One gang member who was identified in an October 2015 email as "calling the shots" in his housing unit was still living there at the time

the EMCF inmates' class action lawsuit went to trial in March 2018. Defendant MTC knew these activities were occurring and had not put a stop to them by that date.

249.     During the period when the class-action lawsuit was pending, Defendant MTC's decision to cede control to prison gangs at EMCF as described above resulted in many assaults and instances of extortion. For instance, MTC employees failed to intervene for four hours while a man was tied up and sodomized by gang members. Later, the individual who was raped and extorted was moved to isolation. In the class-action lawsuit, many others testified to similar experiences at EMCF during that period.

250.     While the EMCF inmates' 2013 class-action lawsuit was pending in federal district court, the United States Attorney for the Southern District of Mississippi brought federal criminal indictments against Chris Epps, a defendant in that lawsuit who was also the Commissioner of MDOC and President of the American Correctional Association (ACA) at the time.

251.     Mr. Epps resigned from those positions the day before he was indicted. He was charged with various forms of public corruption, which included accepting at least $1.47 million in bribes or kickbacks from at least fifteen private prison contractors in exchange for steering them to an estimated $800 million in contracts with MDOC. Additionally, Mr. Epps' corruption scheme involved arranging for these contractors to receive the ACA accreditation required for their contracts with MDOC.

252.     The bribes were arranged through a former Mississippi State Representative, Cecil McCrory, who was retained and paid as a consultant by the private prison contractors who sought and obtained contracts with MDOC through Mr. Epps. Defendant MTC was one of the contractors who retained and paid Mr. McCrory as a consultant to obtain contracts from MDOC.

253.     Through Mr. McCrory, Defendant MTC became involved in Mr. Epps' bribery and kickback scheme, which became known as "Operation Mississippi Hustle." According to the

federal indictment, Mr. Epps signed MDOC contracts with MTC in August 2012, September 2012, October 2012, and July 2013. In each of these instances, the indictment alleges that Mr. McCrory wired several thousand dollars to pay off the mortgage on one of Mr. Epps's properties or to one of his investment accounts around the time the contract was signed. At least one of these contracts involved MTC's operations at EMCF, the subject of the 2013 class action lawsuit.

254.    Upon the disclosure of the federal charges against Messrs. Epps and McCrory, Defendant MTC confirmed that it had paid Mr. McCrory $12,000 per month and had hired him on the recommendation of Mr. Epps. Mr. Epps is quoted as saying "I got us $12,000" per month, and later explained that he told Mr. McCrory that he had persuaded Defendant MTC to hire Mr. McCrory and expected Mr. McCrory to split the $12,000 monthly fee with him.

255.    As part of a plea agreement in which charges against him were reduced in exchange for cooperating with the prosecutors' investigation, Mr. Epps later pleaded guilty to filing a false tax return and conspiracy to launder money. After violating his conditions of release by breaking into his former residence which he had forfeited as part of his plea agreement, Mr. Epps was sentenced to over 27 years in federal prison.

256.    The "Operation Mississippi Hustle" investigation which started with Mr. Epps' indictment led to further indictments and convictions involving more than a dozen other officials, consultants, contractors, and businessmen involved in the private, for-profit prison industry in Mississippi.

257.    On February 8, 2017, Mississippi Attorney General Jim Hood announced that he had filed civil actions against fifteen corporations and numerous individuals who had engaged in contracting activities with MDOC and Mr. Epps. General Hood alleged that "the State of Mississippi has been defrauded through a pattern of bribery, kickbacks, misrepresentations, fraud, concealment, money laundering and other wrongful conduct." MTC was one of the defendants

named in that litigation. Defendant MTC reportedly settled with the State of Mississippi in January 2019 and paid the State $5.2 million as part of the settlement.

258. Keefe Commissary Network, which held a contract with NMCD to provide commissary goods and services in New Mexico prisons, reportedly settled by paying $3.2 million in the Mississippi litigation. Wexford Health Sources, which is also an NMCD contractor, reportedly paid $4 million to settle claims against it in the Mississippi litigation.

259. The EMCF inmates who brought the class action lawsuit against MTC and other defendants in 2013 did not receive a final ruling resulting from the bench trial on their claim for injunctive relief until December 31, 2019. In that ruling, the Honorable William H. Barbour, Senior United States District Judge, stated his belief that "the bribery and kickbacks in which then-MDOC Commissioner [Epps] participated … likely affected the quality of care that was being provided to prisoners as well as other conditions at the facility" during the period before the conclusion of Operation Mississippi Hustle and the above-described civil actions brought by the Mississippi Attorney General.

**F. Policies, practices, and customs of Otero County that evince neglect, mismanagement, and abdication of statutory duties.**

    **1. Otero County's Contracting Practices at OCPF and OCPC.**

260. Defendant Otero County made the decision to enter the private prison industry when it issued government bonds to pay for the construction of OCPF. Construction of the original facility with that bond money was completed in October 2003. An additional wing was constructed in August 2005, also with county bond money. The facility has been used to house both state and federal inmates.

261.    Defendant Otero County also constructed the neighboring OCPC housing federal immigration detainees using county bonds issued in 2007, just prior to the 2008 global financial crisis and before the financial reforms which followed that crisis.

262.    Since its inception, housing of state inmates at OCPF has operated under an arrangement in which Defendant NMCD contracts with Defendant Otero County to house inmates in state custody at its county-owned facility, and then Defendant Otero County subcontracts with Defendant MTC operate and manage that facility.

263.    Similar arrangements apply to the neighboring OCPC. Defendant Otero County contracts with ICE to house immigration detainees at OPCC and then subcontracts with Defendant MTC to operate and manage that neighboring facility. Federal prison inmates are also housed at OCPF under a contract with the federal government.

264.    Under these arrangements, Defendant Otero County has engaged in a policy, custom, and practice of making itself dependent on revenue from its contracts with Defendant NMCD and federal agencies to pay back investors for debts owed on the bonds the county issued to construct OCPF and OCPC. Defendant Otero County has also engaged in a policy, custom, and practice of making itself dependent on cost savings from subcontracting with Defendant MTC to operate and manage OCPF and OCPC in order to obtain enough net revenue from its general contracts to cover the county's payments to investors on its bond debt.

265.    According to a March 2021 Fiscal Impact Report by New Mexico's Legislative Finance Committee, Defendant Otero County reported $22.5 million in bond debt for OCPF that is not scheduled to be fully paid until 2028, as well as $36 million in bond debt for the neighboring OCPC that is not scheduled to be fully paid until 2028, and the county's general fund receives about $1.1 million per year in rents for these facilities from Defendant MTC.

266.   The increased debt burden which Defendant Otero County chose to accept during its flurry of bond activity relating to the construction of OCPF and OCPC between 2002 and 2008, as well as the financial innovation and complexity evident in the arrangements under which Defendant MTC contracted with the county to house state inmates and federal immigration detainees, are part of a larger pattern and practice of unsound financial practices which led to the global financial crisis in 2008.

267.   According to an Internal Revenue Service (IRS) Notice dated August 15, 2017, Defendant Otero County converted its Jail Revenue Project Bonds, Series 2007 from tax-exempt to taxable bonds on August 2, 2017, following an audit which revealed that these bonds meet the private business use and private payment tests, and therefore interest on them is not excludable from gross income under Section 103 of the Internal Revenue Code. Upon information and belief, this change in taxable status made a large percentage of Defendant Otero County's bond portfolio subject to higher interest rates, as well as making interest income taxable for investors.

268.   Defendant Otero County's pattern and practice of inflating the private prison "housing bubble" that burst in the years after the 2008 financial crisis has contributed to the deterioration of conditions of confinement at county-owned prison and detention facilities.

269.   At a February 2021 legislative hearing on a bill to discontinue the State's use of private prison contractors in New Mexico, the Otero County Attorney cited the County's bond debt as its reason for opposing the bill.

**2.   Otero County's notice of MTC's illegal activities and mismanagement.**

270.   Defendant Otero County continued to engage in its custom, policy, and practice of contracting with Defendant MTC to operate and manage county-owned prison and detention facilities from 2003 to the present despite being on notice of the inmate deaths, riots, loss of

contracts, tax audits, downgrades to credit ratings, federal criminal prosecutions, and public corruption scandals discussed in earlier sections of this Complaint.

271.    When selecting, monitoring, and supervising Defendant MTC as its subcontractor to house state inmates pursuant to its contracts with Defendant NMCD, Defendant Otero County knew or should have known of the 2003 DOJ findings regarding Defendant MTC's operation and management of SFCADC.

272.    When selecting, monitoring, and supervising Defendant MTC as its subcontractor to house state inmates pursuant to its contracts with Defendant NMCD, Defendant Otero County knew or should have known that Defendant MTC ended its contractual relationship with Santa Fe County after the 2003 DOJ report on SFCADC was issued in order to avoid compliance with the recommendations in that report.

273.    When selecting, monitoring, and supervising Defendant MTC as its subcontractor to house state inmates pursuant to its contracts with Defendant NMCD, Defendant Otero County knew or should have known of Defendant MTC's record of noncompliance with constitutional standards for conditions of confinement at OCPC, as published in the 2011 ACLU report, the 2018 report by immigrants' rights groups, and the reports of ICE inspections and audits.

274.    When selecting, monitoring, and supervising Defendant MTC as its subcontractor to house state inmates pursuant to its contracts with Defendant NMCD, Defendant Otero County knew or should have known of the riot at WCCC in Willacy County, Texas, in 2015, the lawsuit that Willacy County subsequently brought against Defendant MTC, the federal court records evincing that MTC employees were convicted of bribery, smuggling, and possession of controlled substances at WCCC, and the physical and sexual assaults, cover-ups, and other unlawful activities reported on the nationally broadcast PBS Frontline television episode which first aired in 2011.

275.    When selecting, monitoring, and supervising Defendant MTC as its subcontractor to house state inmates pursuant to its contracts with Defendant NMCD, Defendant Otero County knew or should have known of the numerous published reports regarding the 2010 escape from the MTC-run prison facilities in Kingman, Arizona, the criminal and civil proceedings that followed those escapes, the record of inmate assaults and deaths at the Kingman facilities during MTC's tenure between 2010 and 2015, the 2015 riots and ensuing published reports which resulted in Governor Ducey's decision to terminate Defendant MTC's contract to run the Kingman prison facilities later that year, and the published reports and court records regarding the circumstances in which Neal Early was killed at MTC's Kingman prison facilities in January 2015.

276.    When selecting, monitoring, and supervising Defendant MTC as its subcontractor to house state inmates pursuant to its contracts with Defendant NMCD, Defendant Otero County knew or should have known of the facts regarding Defendant MTC's operation of the EMCF in Mississippi during the pendency of the 2013 class-action lawsuit, the facts which came to light during the federal criminal investigation and prosecution which became known as "Operation Mississippi Hustle" in 2014, Defendant MTC's involvement in the bribery and kickback scheme operated by former MDOC Commissioner Epps and Defendant MTC's own consultant, Mr. McCrory, and the facts which came to light as a result of the Mississippi Attorney General's civil action against Defendant MTC and other contractors.

277.    When selecting, monitoring, and supervising Defendant MTC as its subcontractor to house state inmates pursuant to its contracts with Defendant NMCD, Defendant Otero County knew or should have known that MTC employee Luis Delgadillo and several inmates at OCPF were convicted of conspiracy to distribute heroin into that facility, as reflected in court records filed in *United States v. Delgadillo, supra*.

278.     When selecting, monitoring, and supervising Defendant MTC as its subcontractor to house state inmates pursuant to its contracts with Defendant NMCD, Defendant Otero County knew or should have known that MTC employees at the facility were so undercompensated that they had to file a federal lawsuit under the Fair Labor Standards Act in order to be paid for the actual amount of time they worked at OCPF on each shift, as reflected in the published Tenth Circuit cited above.

279.     When selecting, monitoring, and supervising Defendant MTC as its subcontractor to house state inmates pursuant to its contracts with Defendant NMCD, Defendant Otero County knew or should have known that Defendant MTC has a corporate policy and routine practice of refusing to comply with lawful requests for records regarding its inmates or public records regarding OCPF that are subject to IPRA.

**3.     Otero County's failure to investigate unlawful activity at its own facilities.**

280.     In addition to failing to investigate published reports and court records regarding illegal activities and mismanagement by Defendant MTC and its employees as described above, Defendants Otero County, Sheriff Black and his predecessor sheriffs, and John Does 11-15 have engaged in a pattern and practice of failing to investigate illegal activities involving the county's own employees and facilities.

281.     In addition to OCPF and OCPC, Defendant Otero County owns the Otero County Detention Center (OCDC) near Alamogordo, New Mexico. Defendants Otero County, Black, and John Does 11-15 use OCDC to house pretrial detainees and other persons they have taken into custody.

282.     In 2012, Jerome Gonzales was held in solitary and inhumane conditions of confinement in a cell with no bed, sink, or toilet at OCDC for several months, leaving him permanently disabled. Otero County failed to investigate Mr. Gonzales' unconstitutional

conditions of confinement at its own detention facility, and those conditions were only brought to light after one of Mr. Gonzales' family members filed a civil action alleging that Otero County and its employees violated his rights to procedural and substantive due process. A $2.9 million court-approved settlement of the claims in Mr. Gonzales's lawsuit was finalized in November 2015. *See Estrada v. Blansett et al.*, No. 14-cv-00192 MCA-LAM, Doc. 56 (D.N.M. order approving settlement filed Nov. 9, 2015).

283.     Beginning on December 4, 2013, Roxanne Estrada was held in solitary and inhumane conditions of confinement in a cell with no bed, sink, or toilet at OCDC for a period of more than eleven months until her condition became so emergent that medical staff ordered her transferred to a hospital. Otero County officials placed her back in isolation at the same detention center after she was released from the hospital in January 2015. Even though part of Ms. Estrada's confinement occurred when Otero County was already litigating the Jerome Gonzales case referenced above, Otero County failed to investigate Ms. Estrada's unconstitutional conditions of confinement at its own detention facility, and those conditions were only brought to light after one of Ms. Estrada's family members filed a civil action alleging that Otero County and its employees violated her rights to procedural and substantive due process. A $2 million court-approved settlement of Ms. Estrada's claims against Otero County was finalized in 2018. *See Sanchez v. Blansett et al.*, No. 16-cv-00749 WJ-GBW, Doc. (D.N.M. order filed Jan. 31, 2018).

284.     In 2018, Defendant Otero County was sued a third time for subjecting an individual to solitary and inhumane conditions of confinement for an extended period of time. *See Hicks v. Board of County Comm'rs of the County of Otero et al.*, No. 18-cv-0850 JB-JFR (D.N.M. Second Amended Complaint filed Jan. 14, 2021). According to the pleadings in that case, Carlos Hasan Hicks spent 842 days in solitary and inhuman conditions of confinement in Otero County from January 24, 2016, until April 10, 2019. Even though he was a pretrial detainee and not an inmate

in state custody, Mr. Hicks alleges that he spent many of those days at OCPF, where he was never informed why he was placed in solitary confinement there and never given the opportunity to challenge his conditions of confinement. Mr. Hicks also alleges that he was transferred back and forth between OCPF and OCDC for unknown reasons, and he spent time in solitary and inhumane conditions of confinement at both facilities. Again, Otero County failed to investigate these allegations, which did not come to light until Mr. Hasan filed his lawsuit.

      4.      **Otero County's Violation of Open Records Laws**

285.     On June 19, 2018, and again on August 3, 2018, the HRDC sent a written IPRA request to the Otero County Manager for records created after January 1, 2010, regarding claims or lawsuits made against the Otero County Sheriff's Office, its agents, and employees in which a payment of $1,000 or more was made to resolve the claim or lawsuit.

286.     On July 2, 2018, and again on August 7, 2018, the Otero County Attorney denied HRDC's IPRA request and refused to produce the responsive records. The Otero County Attorney falsely claimed that the records at issue were not "public records" which the County had a duty to produce under IPRA because the County's claims and litigation files were handled by outside defense counsel.

287.     Under the policy, custom, and practice stated in the Otero County Attorney's IPRA correspondence, any public body in New Mexico could avoid its obligations under IPRA by simply contracting with an attorney or agent to store its files. Otero County has followed that policy, custom, and practice both with respect to its contract with Defendant MTC and its use of outside counsel to store its claims and litigation files. The result is that Mr. Bradshaw is unable to present a complete record of Otero County's systemic neglect and dereliction of its duties at the time this Complaint is filed.

288.     During the legislative special session in 2020, the New Mexico Legislature enacted NMSA 1978, Section 28-1-18, which requires law enforcement officers within the state to use body-worn cameras while on duty and retain recordings of that usage for not less than 120 days.

289.     On or about August 3, 2020, Mr. Bradshaw's counsel submitted an IPRA request to Defendant Otero County for records regarding the investigation of Mr. Padilla's violent attack on Mr. Bradshaw in March 2020, including audio and video recordings. This request occurred after Mr. Bradshaw's counsel had timely submitted written notice to Otero County requesting preservation of records regarding Mr. Bradshaw's claims, and after the Legislature enacted Section 28-1-8.

290.     Defendant Otero County's response to Mr. Bradshaw's records request did not include any audio or video recordings or body-worn camera footage to document such an investigation. Instead, the County produced the Otero County Sheriff's Deputy's report falsely accusing Mr. Bradshaw of "mutual combat," with nothing to indicate that the County ever took action on Mr. Bradshaw's complaint regarding Mr. Padilla or any of the reported illegal activities of Defendant MTC, its employees, or other inmates as described above.

291.     The Otero County District Attorney to whom Otero County sheriff's deputies could submit proposed criminal complaints regarding allegations of illegal activity at OCPC was the same Otero County District Attorney who prosecuted Mr. Bradshaw on the charges which resulted in his confinement at OCPF.  Neither the Otero County District Attorney nor Defendant Black nor Defendants John Does 6-10 ever pursued charges against Mr. Padilla arising from his violent attack on Mr. Bradshaw.

**G.     Policies, practices, and customs of Defendant NMCD which evince its neglect, mismanagement, and dereliction of its statutory duties.**

**1.     Defendant NMCD's notice of unlawful policies, practices, and customs of Defendants MTC and Otero County.**

292.    Defendant NMCD continued to engage in its custom, policy, and practice of contracting with Otero County to operate and manage county-owned prison and detention facilities from 2003 to the present and placing inmates at OCPF despite being on notice of the inmate deaths, riots, loss of contracts, tax audits, downgrades to credit ratings, federal criminal prosecutions, and public corruption scandals discussed in earlier sections of this Complaint.

293.    Additionally, Defendant NMCD continued to engage in its custom, policy, and practice of contracting with Otero County to operate and manage county-owned prison and detention facilities from 2003 to the present and placing inmates at OCPF despite being on notice of Otero County's failure to investigate mistreatment and abuse of detainees at OCDC as documented in the lawsuits filed by family members of Jerome Gonzales and Roxanne Estrada described above.

## 2.    Defendant NMCD's longstanding use of faulty inmate classification systems.

294.    Classification according to reliable and valid assessments of security risks plays a central role in protecting each inmate in state custody from violent attacks and exploitation at the hands of other inmates and prison staff.

295.    New Mexico lacked a formal inmate classification system before the 1980 riot at the Penitentiary of New Mexico (PNM) which left 33 inmates dead. The State's first inmate classification system emerged from the 1980 consent decree in *Duran v. Grisham*, No. 77-cv-00721 KK-SCY (D.N.M. July 15, 1980).

296.    Another New Mexico prison riot occurred at the Guadalupe County Correctional Facility in 1999 and was preceded by violent attacks on several individuals within that prison. Review of the State's classification system after the 1999 riot led to the changes that resulted in the present classification system. Upon information and belief, that system was used to make and

78

implement classification decisions with respect to Mr. Bradshaw and the other inmates with whom he was housed while in state custody.

297.    Defendant NMCD's present classification system is more than 20 years old and does not comply with current industry standards or guidance provided by the National Institute of Corrections (NIC). The reliability and validity of the present system's tools for initial classification and reclassification has not been tested and is not subject to continuous monitoring.

298.    In 2016, Defendant NMCD initiated a contract with the Institute for Social Research (ISR) at the University of New Mexico to review its classification system. In 2017, ISR provided Defendant NMCD with the results of a phase-one study which examined and identified problems with the system's efficacy, including NMCD's external classification tool, use of discretionary and mandatory overrides, and other issues. In 2019, ISR provided Defendant NMCD with the results of a phase-two study testing the reliability of new initial classification and reclassification tools for men and separate tools for women, which incorporated recommendations based on the findings from ISR's phase one study.

299.    The results of the first two phases of the ISR study were not released to the general public until they appeared in materials for a legislative hearing prepared by the New Mexico Legislative Finance Committee (LFC) dated July 16, 2020. Upon information and belief, Defendant NMCD has not yet changed its classification system to conform to the ISR study.

300.    Pursuant to the Second Revised Settlement Agreement which received final approval in the *Duran* litigation in 2020, Defendant NMCD is obligated to contract with ISR and consultant James Austin to validate its classification system using revised custody scoring tools for men and women. The July 2020 LFC report estimated that validation process would conclude in Summer 2022.

301.     The requirements for reforming the State's inmate classification system in the 2020 revision to the *Duran* settlement agreement arose from the discovery that the private operator of the State's former women's prison in Grants, New Mexico employed its own classification staff, had been housing inmates together regardless of their classification, and was not regularly reclassifying those inmates or adequately maintaining their records. That discovery occurred in 2015 when NMCD was preparing to divide its female inmate population from a single facility into two separate facilities with different security levels.

302.     At a hearing in the *Duran* litigation, the State's attorney told the Court that "there was indiscriminate mixing of inmates at different levels. There were failures to score, there were misclassifications of inmates" and "lapses in classification" with "no oversight by the classification bureau" at NMCD. The Plaintiffs' attorney in turn argued that these problems persisted and placed minimum-security inmates at risk. The requirement of completing classification reforms based on the ISR studies in the 2020 revision to the *Duran* settlement agreement was aimed to significantly reduce that risk.

303.     At the time of Mr. Bradshaw's incarceration at OCPF, that facility was plagued with many of the same types of classification problems which had been identified in the ISR studies and in the hearings leading to the 2020 revision of the *Duran* settlement agreement. Those issues also highlight the extent to which problems with the State's classification system are interconnected with the problems arising from the State's use of contracting schemes which allow for the use of substandard private prison contractors such as Defendant MTC to operate and manage facilities such as OCPF.

304.     The classification problems noted above also have cost implications. An LFC presentation in July 2020 estimated that the cost savings that would result from fixing over-classification problems and moving more properly classified inmates to minimum-security

facilities would be $28 million annually—more than enough to pay off all of Otero County's remaining $22.5 million bond debt for the construction of OCPF in a single year.

### 3. Defendant NMCD's repeated use of substandard private prison contractors.

305. Defendant NMCD has long been aware of the controversy surrounding its overreliance on substandard private prison contractors to house, secure, and provide health care to its inmate populations, as well as the adverse effects of such reliance.

306. In 2007, the New Mexico Legislature's Legislative Finance Committee (LFC) hired two outside doctors to review the performance of NMCD's health care contractor at the time, Wexford Health Sources, and issued a report which concluded that: "The quality of inmate care is hampered by deficiencies in staffing, policies, protocols, record keeping, data collection, and communication systems. In addition, the department's oversight and the quality improvement program have failed to identify problems in a timely fashion." NMCD subsequently terminated its contract with Wexford and hired a different private, for-profit company, Corizon, to provide health care services to inmates in state custody.

307. The 2007 LFC report also contained findings regarding New Mexico's overreliance on private contractors and questionable practices with respect to prison planning and construction. The report found that New Mexico had the highest percentage of inmates in private prisons in the nation and paid significantly higher rates to house inmates in private prisons than other states did for similarly classified inmates--yet those facts did not result in significant cost savings or performance improvements for the State.

308. In 2015, the New Mexico Legislature established a Corrections Health Care Task Force to study ways to optimize quality and efficiency in Corrections Department health care. Two legislative committees held a joint meeting on October 27, 2016, to discuss the work of that task force and hear from its members, including NMCD's Deputy Secretary at the time, Alex Sanchez.

309.   At the joint meeting, the committees heard testimony from attorneys representing prisoners in the state, who reported a pattern of neglect with respect to inmate health care, including complaints with respect to diabetes, cancer, Hepatitis C, untreated broken bones, hernias, kidney stones, dental problems, and medications not being provided. NMCD Deputy Secretary Sanchez also acknowledged that NMCD did not have its own medical director and relied on a Health Services Director who was not a medical professional to monitor and audit the medical care provided by its contractors at that time.

310.   The issue of solitary and inhumane conditions of confinement was also on the agenda at the joint committee meeting on October 27, 2016. In response to concerns expressed on that issue, the Director of NMCD's Adult Prisons Division at the time, Jerry Roark, is quoted in the committee's minutes as saying: "there will always be illegal activity in prisons, be it trafficking, gambling or something else. That activity will spur outbursts of violence, which will, in turn, require the separation of inmates." NMCD thus acknowledged and admitted there is a causal connection between such illegal activities and outbursts of violence by inmates within its Adult Prisons Division.

311.   The results of a six-month investigation by the *Santa Fe New Mexican* reported in 2016 found that of about 160 quarterly audits that NMCD's written policy required at each facility where its health services contractor provided services to inmates in state custody between 2012 and 2015, NMCD could produce records for only 20 such audits. The *Santa Fe New Mexican* further reported that employee warnings about short staffing, substandard care, and a lack of auditing went unheeded, and by May 2015 NMCD's contract monitor found staff shortages month after month.

312.   NMCD fined Corizon $1 million for not meeting its staffing requirements under the contract in effect at the time, and in May 2016, NMCD again switched to another health

services contractor, Centurion. The fines for staff shortages continued after Centurion took over the contract, with NMCD imposing fines of at least $1.1 million in the first two fiscal years of that contract.

313.    On or about August 7, 2018, the LFC presented an overview of NMCD's inmate health care contracts to a joint meeting of two legislative committees attended by NMCD's Director Adult Prisons and Health Services Administrator. Again attorneys representing inmates presented testimony regarding inmate health complaints, and committee members suggested that the State should actively pursue moving from the use of private, for-profit prison contractors to a publicly-run health-care system in its prisons. NMCD officials admitted at the joint meeting that there had been no financial analysis in the last four years to compare the cost of operating public versus privately contracted prison facilities in the state.

314.    The LFC followed up with another report dated October 23, 2018, which found that in addition to the contractor's understaffing problems, NMCD had a 25% vacancy rate among its own staff positions responsible for medical contractor oversight. The 2018 LFC report further found that NMCD's medical contracts lacked quality-of-service data, and the contractor was still relying on a paper records system in which health records were stored in boxes in warehouses in different prisons throughout the State. This practice left contract monitors and auditors unable to retrieve and analyze data on inmate health outcomes in a timely and meaningful way. Instead, inmates were left to seek discovery through the "dozens of lawsuits alleging inmate neglect or mistreatment" that were noted in the 2018 LFC report.

315.    The 2018 LFC report also found that NMCD was underutilizing the State's rules for medical and geriatric paroles. In Fiscal Year 2018, medical parole applications accounted for only 0.5 percent of total Parole Board activity.

316.     Returning to the financial analysis questions left unanswered at the 2018 joint committee meeting referenced above, the New Mexico Legislature's Courts, Corrections and Justice Committee heard testimony and received a report from the Center for Civic Values (CCV) on September 4, 2019, which compared the costs of operating privately run prisons with those of publicly run facilities. The CCV report reviewed findings by National Institute of Justice, the General Accounting Office, the University of Utah, and the Arizona Department of Corrections, and concluded that hidden, long-term costs of utilizing private, for-profit prisons in New Mexico outweighed any short-term cost savings.

317.     The 2019 CCV report cited research studies which show that private prisons are more violent than public prisons, and one of the causes of this increased violence at private prisons is private prison companies cutting corners on staffing, which reduces company operating costs, thereby increasing profits. The 2019 CCV report recommended that the New Mexico Legislature enact a moratorium on renewals of existing contracts with private detention facilities.

318.     Despite their actual knowledge of all the research and reporting summarized above, Defendants NMCD and Lucero chose to award a contract to provide health-care services to inmates in state custody to Wexford Health Sources in 2019—the same company which NMCD fired in 2007 based on the findings in the 2007 LFC report cited above.

319.     Upon information and belief, Defendants NMCD and Lucero also renewed NMCD's contract with Otero County in 2021 despite their knowledge of all the information reported above, and despite the United States Justice Department's decision that year to end its reliance on private contractors to operate and manage federal prisons.

320.     At a February 2021 legislative hearing before the House Consumer and Public Affairs Committee, the Otero County Attorney spoke out against a bill to end the State's reliance on privately-run prison facilities and cited $58 million in county debt as the reason for keeping

NMCD's contract with OCPF. When asked about the value and expiration dates of Defendant MTC's Otero County prison contracts, the company's Director of Communications stated "this is proprietary information" and declined to answer.

**4.  NMCD's neglect and mismanagement of contracts for private, for-profit commissaries at prison facilities.**

321.    In addition to contracting with private, for-profit companies to house inmates in state custody and provide health care services for them, NMCD contracts with private, for-profit vendors to run the commissaries at both state-run and privately-run prison facilities in New Mexico.

322.    The current commissary contract for NMCD prison facilities is the subject of pending litigation. *See Keefe Commissary Network LLC v. Lucero*, Nos. D-101-CV-2021-01830 (1st Jud. Dist. Ct. notice of appeal filed Dec. 7, 2021), D-101-CV-2021-01936 (1st Jud. Dist. Ct. Verified Petition for Writ of Mandamus for Violations of IPRA filed Sept. 7, 2021), and D-101-CV-2021-02066 (1st Jud. Dist. Ct. notices of appeal filed Dec. 7, 2021).

323.    According to published reports, Defendant NMCD awarded the previous commissary contract to Keefe Commissary Network (Keefe), and that contract gave NMCD a 32% commission on Keefe's sales. NMCD Spokesperson Eric Harrison has stated that Keefe may have sold about $3 million in worth of goods to state prisoners in Fiscal Year 2021, and NMCD collected about $1 million in commissions on those sales.

324.    According to published reports, Keefe submitted a proposal for a new contract that would have increased NMCD's commission on commissary sales to 36%, but NMCD instead awarded the new contract to Union Supply Group (Union), which submitted a proposal under which NMCD's commission rate would be 32.5 percent. In the litigation over the contract award, Keefe contends that it was treated unfairly for openly discussing the company's proposed higher

commission rate during an oral presentation to an evaluation committee. NMCD's contract award decision is currently on appeal.

325. Commission rates for prison commissary vendors are and have been a source of controversy for several years. One of the reasons for this controversy is the adverse effect that high commissary prices have on inmate populations who are forced to purchase items from a private, for-profit vendor who holds a monopoly on commissary sales and also charges its own significant markup on the goods it sells or distributes.

326. According to a lawsuit filed in this Court, for example, Keefe charged inmates $14.27 for an 8-ounce jar of Folger's coffee under its previous contract with NMCD. *See Hunnicutt v. Lucero et al.*, No. D-101-CV-2020-027272 (1st Jud. Dist. Ct. complaint filed Dec. 22, 2020), No. 21-cv-00867 JCH-JFR (D.N.M. notice of removal filed Sept. 3, 2021). Union reportedly proposed to charge $14.25 for the same item under the new contract. An internet product search performed on February 17, 2022, revealed that the same size jar of Folger's coffee is available from Amazon.com for the EBT and SNAP eligible price of $5.26 with free shipping.

327. Another reason why commission rates for commissary vendors are and have been a source of controversy is the extent to which they resemble the bribes and kickbacks at issue in the "Operation Mississippi Hustle" criminal prosecutions and ensuing civil litigation discussed above. Both Defendant MTC and Keefe were involved in the Mississippi litigation and ultimately agreed to pay back millions of dollars they received from corrupt prison contracts in Mississippi.

328. The payment scheme that NMCD and its commissary vendors euphemistically describe as a "commission" mirrors and enables the extortion racket that Mr. Bradshaw described Messrs. Padilla, Soto, and Apodaca running in Unit S2 during their incarceration at OCPF. Under this scheme, Defendant NMCD, the commissary contractor, the inmate extortion racket, and Defendant MTC form a joint venture in which they mutually benefit.

329.     In this joint venture, Defendant NMCD receives a substantial commission in exchange for overlooking the steep markup that the commissary contractor is already charging on items it sells to inmates. Capitalizing on both Defendant NMCD's and the commissary contractor's tolerance for such skimming and markups, the inmate extortion racket then exacts its own markup on the rest of the inmate population and enforces a code of silence in which inmates face retribution for not acquiescing to the excessive prices the joint venture charges for commissary items.

330.     The inmate extortion racket and commissary vendor also reward private prison contractors such as Defendant MTC by allowing the inmate extortion racket to provide commissary items to other inmates in exchange for signing false paperwork to document recreation time so that Defendant MTC can submit that false paperwork to misrepresent the status of its compliance with contractual obligations to Defendants NMCD and/or Otero County.

331.     Such excessive pricing and misuse of the commissary system has a particularly coercive, extortionate, and disruptive effect on the inmates and inmate families who must pay for it. Many of the items they must purchase through the joint venture are basic necessities inmates need to take care of their daily dietary, health care, and personal hygiene needs.

332.     In Mr. Bradshaw's case, for example, he needed to trade commissary items for food items in order to meet his special dietary needs as a diabetic when Defendant MTC's staff failed to provide him a diabetic tray at OCPF. There are reports that female inmates have even been required to purchase their monthly feminine hygiene products from an overpriced commissary.

333.     The disruptive effects of extortionate and excessive commissary pricing are magnified by the low wages inmates are typically paid for their labor in the prison system. Ironically, some prisons even require inmates to do work necessary to operate the prison's excessively priced commissary system while paying them exceptionally low wages for doing so.

Those low wages add to the commissary vendor's profit margin while increasing the economic burden on the inmate purchasers.

334.    The disruptive effects of the extortionate and excessive pricing for commissary purchases are also magnified by differences in socioeconomic status among inmates. Some inmates have family members or others in their socioeconomic strata who can afford to send funds to their commissary accounts at the prison. Others do not, which may lower their socioeconomic status within the prison unless they can find another means of obtaining commissary items for themselves—such as extorting other inmates.

335.    The extortion racket which exploited prison commissary sales at OCPF also contributed to violence in the facility and did so with respect to Mr. Padilla's attack on Mr. Bradshaw described above. As former Director of Adult Prisons Jerry Roark previously admitted during his testimony before the New Mexico Legislature in 2016, "illegal activity in prisons … will spur outbursts of violence."

336.    Such excessive pricing is not necessary to operate a commissary system within a prison that houses inmates in state custody. A 2017 report by the Marshall Project documented other states that charge much lower commissions and prices for commissary sales. West Virginia reportedly had a 17% commission; Los Angeles County's contract with Keefe reportedly requires that prices fall within 2 percent of the cost of the same item at any three convenience stores and grocery stores within a 12-mile radius. The Marshall Project reported that a radio which costs $22 at Franklin County Jail in Pennsylvania costs less than $13 in Custer County, Nebraska. A bra reportedly purchased from Union at Arrendale State Prison in Georgia for $13.80 costs $25.95 at the Northeast Correctional Complex in Tennessee.

337.    Instead of skimming $1 million per fiscal year from commissions on commissary sales at prisons in New Mexico, the State could save several more million dollars each year by

reforming its classification system as outlined in the ISR studies referenced above—with additional savings left over in an amount sufficient to pay off Otero County's bond debt claims.

338.    In any event, the profits and commissions from commissary sales at New Mexico's prisons do not bring in enough revenue for taxpayers to justify the hidden costs and burdens that the joint venture described above imposes on inmates and their families. Mr. Bradshaw and his family can attest to those costs and burdens, which he seeks to bring to light through this lawsuit.

339.    Defendant NMCD has a legitimate and well-founded interest in utilizing a scoring system to award a new commissary contract in 2021 that favors the proposal which offers the lowest net prices to inmates. That a private, for-profit commissary contractor can sue the State for not awarding a contract charging an excessively high commission of 36% further evinces that the commissary system is badly flawed.

**5.    Defendant NMCD's violations of open records laws and discovery orders.**

340.    As described above with respect to IPRA violations by Defendants MTC and Otero County, Mr. Bradshaw is unable to present a complete record of the company's mismanagement and unlawful activities at OCPF at the time this Complaint is filed. Defendant NMCD's complicity in those IPRA violations also detracts from Mr. Bradshaw's ability to bring those activities to light.

341.    The HRDC litigation described above evinces Defendant NMCD's failure to administratively enforce its contractors' compliance with IPRA in the face of clear precedent holding that such compliance is judicially enforceable, as well as contracting practices in other states that include compliance with open records laws among the prerequisites for government contracts. Defendant NMCD thus has a policy, custom, and practice of allowing its private prison contractors to unlawfully defy New Mexico precedent interpreting IPRA, failing to enforce that precedent administratively through its own contracting practices, and instead aiding, abetting, and enabling IPRA violations by its contractors.

342.     In addition to IPRA violations, Defendant NMCD has been the subject of sanctions for destroying its records in defiance of court orders requiring their preservation and production. *See McDermott v. New Mexico Corrections Dep't*, No. D-101-CV2017-00871 (1st Jud. Dist. Ct. order granting motion for sanctions filed Sept. 6, 2019). Those sanctions were imposed in a lawsuit where a former NMCD employee, clinical psychologist Bianca McDermott, alleged that she was subject to retaliation for raising concerns about inmate care while employed as NMCD's Behavioral Health Bureau chief. According to court records, Defendant NMCD destroyed records in numerous employee email accounts which are or were likely to be relevant to the issue of monitoring contracts with one or more of the private, for-profit prison contractors described above.

343.     The retaliation and cover-ups alleged in Dr. McDermott's lawsuit are consistent with, and provide further notice of, the pattern of illegal activity that resulted in Mr. Bradshaw's damages and injuries in this case.

### COUNT I:     MR. BRADSHAW'S FEDERAL CIVIL RIGHTS CLAIMS AGAINST DEFENDANTS MTC, WARDEN MARTINEZ, AND JOHN DOES 1-5.

344.     Mr. Bradshaw realleges and incorporates all the preceding paragraphs of this Complaint as if fully stated herein.

345.     Defendants MTC, Warden Martinez, and John Does 6-10 are collectively referenced in this count as "the MTC Defendants."

346.     During the period of his incarceration described above, Mr. Bradshaw had clearly established constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution, which applied to each of the MTC Defendants as state actors operating under color of state law. These included the clearly established right to be free from cruel and unusual punishment, as well as the clearly established right to be free from state action that is so arbitrary and outrageous that it shocks the conscience of federal judges.

347.    Each of the MTC Defendants were under a duty to protect Mr. Bradshaw's constitutional rights by providing him with humane conditions of confinement and taking reasonable steps to protect him from substantial risks of serious harm, including the risk of being violently attacked by another inmate under the circumstances described above, and to refrain from arbitrary and outrageous actions that would result in such a violent attack.

348.    During his confinement at OCPF, Mr. Bradshaw was incarcerated under conditions which objectively posed a substantial risk of serious harm to him, including the risk that he would be violently attacked by one or more of the inmates to whom each of the MTC Defendants had ceded control of the Unit S2 dormitory at OCPF, as described above.

349.    Each of the MTC Defendants were subjectively aware of the substantial risk of serious harm to Mr. Bradshaw and other similarly situated inmates at OCPF. Each of the MTC Defendants drew the inference that he and other similarly situated inmates were at substantial risk of such serious harm under the circumstances described above.

350.    Each of the MTC Defendants were deliberately indifferent to the substantial risk of serious harm to Mr. Bradshaw and other similarly situated inmates at OCPF. Each of them disregarded that risk by failing to take reasonable measures to abate it.

351.    Such reckless disregard not only lacked a legitimate penological purpose; it was directly contrary to the State's own interest in protecting and preserving its own witness's ability to testify in the serious felony cases pending in Dona Ana County described above.

352.    Defendant MTC had a corporate policy of failing to meet minimum constitutional standards of care at the facilities it operated in order to cut its operating costs at those facilities under the type of contractual arrangements with Defendants Otero County, NMCD, and other governmental entities described above. Defendant MTC also had a corporate policy of disengaging from contracts for the operation of prisons and detention facilities when the obligations resulting

91

from those contracts would require the company to meet minimum constitutional standards of care or provide a lasting, systemic remedy for violations of those standards.

353.    In addition to its corporate policies described above, Defendant MTC had informal customs of (1) understaffing the company's operations at OCPF so that inmate populations were not safely classified, monitored, or controlled; (2) undertraining its employees so they lacked the knowledge and skills necessary to establish a command presence, recognize appropriate professional boundaries with inmates, or perform their duties at minimally competent levels; (3) undercompensating its employees so they were unduly susceptible to financial exploitation; (4) over-delegating the company's recordkeeping and other work functions to inmates; (5) dangerously overcrowding units in the facility with mixed classifications of inmates housed in close quarters in open, dormitory-style units with no corrections officer present and no safe area to retreat; (6) ceding control of those units to prison gangs or dominant groups of inmates who exploited and harmed other inmates, and (7) failing to provide a meaningful grievance procedure for investigating or redressing inmate complaints.

354.    The informal customs listed above amounted to a widespread practice by Defendant MTC that was so permanent and well settled as to constitute a custom or usage with the force of law at the time Mr. Bradshaw's constitutional rights were violated as described above.

355.    The policies, customs, and practices described above amounted to a *de facto* "hands off" policy that systematically devolved responsibility across multiple officers and employees of Defendant MTC and was unconstitutional because it failed to ensure that any single officer or employee was positioned to prevent the constitutional violations described above.

356.    Defendant Warden Martinez and John Does 1-5 personally participated in implementing Defendant MTC's corporate policies, customs, and practices described above and

were personally involved in creating the unlawful conditions of confinement which led to both the violent attack on Mr. Bradshaw and the improper response to it described above.

357.     By employing Defendant Martinez in the capacity of Warden at OCPF, Defendant MTC invested him with final policymaking authority with respect to the policies, customs, and practices described above. The implementation and continuation of those policies, customs, and practices amounted to a conscious decision by Defendant Martinez to engage in a "hands off" policy which was a cause of the violation of Mr. Bradshaw's constitutional rights under the circumstances described above.

358.     In his capacity as the Warden of OCPF invested with final policymaking authority, Defendant Martinez also ratified the unlawful decisions—and the unlawful basis for them— proffered by his subordinates to whom authority was delegated subject to his review and approval. These subordinates included Defendants John Does 1-5 and/or Messrs. Padilla, Soto, and Apodaca. Defendant Martinez ratified one or more of these subordinates' decisions with respect to taking a "hands off" approach which ceded control of Unit S2 to Messrs. Padilla, Soto, and Apodaca, causing them to solicit Mr. Bradshaw's involvement in their unlawful, extortionate activities at OCPF, punishing him for attempting to avoid such involvement, and attempting to cover up, avoid responsibility for, and prevent proper investigation of such unlawful activities.

359.     Defendant MTC and Martinez failed to adequately train or supervise the company's employees, including but not limited to Defendants John Does 1-5, in the manner described above. Defendants MTC and Martinez were also deliberately indifferent to the substantial risk of serious harm that may be caused by that failure, including the violation of Mr. Bradshaw's constitutional rights under the circumstances described above. Those circumstances involved a recurring situation that presented plainly obvious and highly predictable risks of a constitutional violation, to which Defendants MTC and Martinez responded by continuing to adhere to an approach the

company knew and should have known has failed to prevent a pattern of tortious conduct by its employees and agents in the past.

360.    The sum of multiple officers and employees' actions or inactions taken pursuant to Defendant MTC's policies, customs, or practices described above, including those of Defendants Martinez and John Does 1-5, amounted to a "moving force" that resulted in the violation of Mr. Bradshaw's constitutional rights.

361.    The violations of Mr. Bradshaw's constitutional rights by Defendant MTC, Martinez, and John Does 1-5 as described above were a direct and proximate cause of Mr. Bradshaw's injuries and resultant damages.

362.    The law provides for Mr. Bradshaw to receive an award of compensatory damages from Defendant MTC for the violation of his federal civil rights as described above, as well as an award of reasonable attorney fees, costs, and interest as provided by law.

363.    The acts and omissions of Defendants Martinez and John Does 1-5 described above were intentional, malicious, sadistic, willful, wanton, obdurate and in gross and reckless disregard of Mr. Bradshaw's constitutional rights as described above.

364.    The law provides for Mr. Bradshaw to receive an award of compensatory and punitive damages from Defendants Martinez and John Does 1-5 for the violation of his federal civil rights as described above, as well as an award of reasonable attorney fees, costs, and interest as provided by law.

## COUNT II: MR. BRADSHAW'S STATE-LAW CLAIMS AGAINST DEFENDANTS MTC, WARDEN MARTINEZ, AND JOHN DOES 1-5.

365.    Mr. Bradshaw realleges and incorporates all preceding paragraphs of this Complaint as if fully stated herein.

366.     Defendants MTC, Martinez, and John Does 1-5 are not "public employees" of a "public body" or "government entity" for purposes of the New Mexico Tort Claims Act (NMTCA).

367.     Defendant MTC is a "contractor" and OCPF is a "facility" for the purpose of assuming all liability and providing liability insurance or other proof of financial responsibility sufficient to cover all liability caused by or arising out of all aspects of the provision or operation of that facility under NMSA 1978, Section 33-1-17.

368.     Defendants MTC, Martinez, and John Does 1-5 are collectively referenced as "the MTC Defendants" in this count of Mr. Bradshaw's Complaint.

A.     **The MTC Defendants' negligence under common-law tort principles.**

369.     In undertaking to house, transport, warn, communicate with, and protect Mr. Bradshaw from harm during his incarceration at OCPF, and to contract with Otero County and/or NMCD for the provision of those services, each of the MTC Defendants were under a duty to perform in accordance with a reasonably prudent person's standard of care in their operation and maintenance of the premises, buildings, machinery, equipment, and furnishings at OCPF. That duty and standard of care are defined according to traditional tort concepts under New Mexico common law applicable to these Defendants.

370.     In operating and managing the premises at OCPF, each of the MTC Defendants had a common-law duty to use ordinary care to keep the premises safe for Mr. Bradshaw and other occupants, whether or not a dangerous condition was obvious. In performing this duty, each of the MTC Defendants was charged with the knowledge of any condition of an inmate's confinement on the premises at OCPF which was caused by Defendant MTC, its employees, or its agents. Each of the MTC Defendants was also charged with the knowledge of any such condition of which they would have known had they made a reasonable inspection of the premises.

371. Each of the MTC Defendants had a common-law duty to exercise ordinary care, at all times, to prevent harm to others, including Mr. Bradshaw. This duty required each of the MTC Defendants to keep a proper lookout and maintain proper control of the machinery, equipment, and furnishings at OCPF to avoid placing the operator or others in danger and to prevent harm to them.

372. The common-law duty to keep a proper lookout requires more than mere looking. It also required each of the MTC Defendants to actually see what was in plain sight. With respect to that which is not in plain sight or readily apparent, each of the MTC Defendants were required to appreciate and realize what was reasonably indicated by that which was in plain sight.

373. The MTC Defendants breached their duties as described above and failed to perform in accordance with a reasonably prudent person's standard of care in the context of operating and maintaining premises, buildings, machinery, equipment, and furnishings to house, transport, warn, communicate with, and protect Mr. Bradshaw from harm, and to contract for the provision of those services, during his incarceration at OCPF.

374. The MTC Defendants' negligent operation and maintenance of premises, buildings, machinery, equipment, and furnishings at OCPF included, but is not limited to:

A. Housing Mr. Bradshaw on premises where he was left unmonitored, unduly exposed to extortion and violent attack, and without adequate care for his serious medical needs for significant periods of time, and where he was physically barred from safe avenues of retreat and access to reasonably prudent staff qualified to screen, diagnose, treat, warn, communicate with, protect and care for inmates presenting with his conditions of confinement, symptoms, and medical history.

B.      Failure to properly operate and maintain the machinery, equipment, and furnishings at OCPF reasonably necessary to screen, diagnose, treat, warn, communicate with, protect and care for Mr. Bradshaw and his serious medical needs.

C.      Failure to timely and properly operate and maintain the machinery, equipment, and furnishings at OCPF reasonably necessary to accurately and completely record and communicate threats and conditions of confinement which jeopardized Mr. Bradshaw's personal safety, as well as Mr. Bradshaw's symptoms, reported medical history, or the known or reasonably foreseeable risks described above to qualified members of Defendant MTC's staff, leadership, or medical personnel, or to law enforcement and corrections personnel employed by the government.

D.      Failure to properly operate and maintain the premises, buildings, machinery, equipment, and furnishings at OCPF reasonably necessary to arrange for timely transfer of Mr. Bradshaw to another facility or housing unit where he would not be subject to extortion and violent attack.

E.      Failure to properly operate and maintain the premises, buildings, machinery, equipment, and furnishings at OCPF reasonably necessary to arrange for timely emergency medical transport of Mr. Bradshaw to a hospital or other appropriate off-site health care facility, and imposing physical barriers which effectively prevented him from summoning emergency medical transport, care, records, or communications on his own initiative.

375.    Each of the MTC Defendants' negligent operation and maintenance of premises, buildings, machinery, equipment, and furnishings at OCPF as described above was a direct and proximate cause of the injuries and resulting damages claimed by Mr. Bradshaw in this action.

376.    The acts and omissions of Defendants MTC, Martinez, and John Does 1-5 described above were intentional, malicious, sadistic, willful, wanton, obdurate and in gross and reckless disregard of their duties as described above.

377.    The law provides for Mr. Bradshaw to receive an award of compensatory and punitive damages from Defendant MTC for the negligent condition of the premises at OCPF as well as each of the MTC Defendants' negligent operation and maintenance of the buildings, machinery, equipment, and furnishings at OCPF, including those articulated in his prayer for relief below, as well as costs as interest as provided by law.

**B.    The MTC Defendants' professional negligence**.

378.    In undertaking to operate and manage a correctional facility housing inmates in state custody, each of the MTC Defendants was under the duty to possess and apply the knowledge and to use the skill and care employed by reasonably well-qualified corrections professionals in reasonably well-operated correctional facilities under similar circumstances, and to perform in accordance with a reasonably prudent person's standard of care with respect to providing safe, lawful, and humane conditions of confinement to inmates at OCPF, including Mr. Bradshaw. That duty and standard of care are defined according to traditional tort concepts under New Mexico common law applicable to these Defendants.

379.    Each of the MTC Defendants breached their duties as described above and failed to perform in accordance with a reasonably prudent person's standard of care in their management and operation of OCPF, as well as the conditions of confinement they created and maintained for inmates at OCPF, including Mr. Bradshaw.

380.    The MTC Defendants' negligent operation of the correctional facility at OCPF and failure to provide safe, lawful, and humane conditions of confinement at that facility includes, but is not limited to:

A.      Failing to hire, train, supervise, and retain reasonably prudent staff and contractors at OCPF to operate and manage the correctional facility in accordance with professional standards of care for inmates in state custody.

B.      Permitting the exercise or continued exercise of the authority and duties of corrections staff by employees at OCPF when each of the MTC Defendants knew or reasonably should have known that those employees were not qualified to exercise that authority or those duties.

C.      Creating the appearance that they delegated the authority to exercise the authority and perform the duties of corrections staff to inmates such as Messrs. Padilla, Soto, and Apodaca, and ratifying the conduct of those inmates with respect to falsifying records and engaging in extortion at OCPF.

D.      Engaging in a joint enterprise with inmates such as Messrs. Padilla, Soto, and Apodaca for the common purpose of extorting, threatening, and silencing Mr. Bradshaw in exchange for special privileges and benefits in which the members of that joint enterprise had a right to share and control.

E.      Failing to provide safe, lawful, and humane conditions of confinement and care for inmates such as Mr. Bradshaw, when it was known or reasonably foreseeable that such failure would place inmates such as Mr. Bradshaw at unreasonable risk of infection and disease, serious personal injury, and unnecessary pain, suffering, and expense.

F.      Failure to recognize, create, and implement reasonably prudent policies, procedures, protocols, and plans for classification, diagnosis, treatment, warning, and communication of Mr. Bradshaw's serious medical needs and threats to his personal safety.

G.      Allowing Mr. Bradshaw's serious medical needs and threats to his personal safety to go unmonitored and unattended by qualified professional staff for significant periods of

time while in state custody at OCPF despite the known or reasonably foreseeable risks described above.

H.     Failing to timely, accurately, or completely communicate Mr. Bradshaw's symptoms, reported medical history, dietary needs, medications, or the known or reasonably foreseeable risks to his personal safety occasioned by his conditions of confinement, to qualified members of Defendant MTC's staff, leadership, or health care providers, or to law enforcement or corrections personnel employed by the government.

I.     Failure to timely prepare for, call for, or arrange transfer to an appropriate hospital or other off-site health care facility capable of properly diagnosing and treating Mr. Bradshaw's serious medical needs, or to another correctional facility or housing unit capable of protecting him from violent attack and extortion by other inmates.

381.    Each of the MTC Defendants' professional negligence at OCPF as described above was a direct and proximate cause of injuries and resulting damages claimed by Mr. Bradshaw in this action.

382.    The acts and omissions of Defendants MTC, Martinez, and John Does 1-5 described above were intentional, malicious, sadistic, willful, wanton, obdurate and in gross and reckless disregard of their professional duties as described above.

383.    The law provides for Mr. Bradshaw to receive an award of compensatory and punitive damages from Defendant MTC for each of the MTC Defendants' professional negligence at OCPF, including those articulated in his prayer for relief below, as well as costs and interest as provided by law.

C.     **The MTC Defendants' negligence *per se*.**

384.    There were statutes in force in the State of New Mexico at the time of the events described above which provided that:

A.      Contracts with private companies to house inmates in state custody shall include provisions setting forth comprehensive standards for conditions of incarceration (NMSA 1978, Section 33-1-17(D)(1)).

B.      Employees of a private contractor housing inmates in state custody shall be deemed correctional officers for the purposes of NMSA 1978, Sections 33-1-10 and 33-1-11 (NMSA 1978, Section 33-1-17(E)).

C.      Correctional officers shall have the power of a peace officer with respect to arrests an enforcement of laws when on the premises of a New Mexico correctional facility (NMSA 1978, Section 33-1-10).

D.      Correctional officers shall be adult citizens of the United States with a high school education or equivalent who are of good moral character, have not been convicted of a felony or infamous crime, and have successfully passed any physical and aptitude examination that NMCD may require (NMSA 1978, Section 33-1-11).

385.    These statutes were enacted for the benefit or protection of the class of law-abiding inmates to which Mr. Bradshaw belonged at the time of the events described above.

386.    Each of the MTC Defendants violated these statutes by:

A.      failing to comply with comprehensive standards for conditions of incarceration that are statutorily required under Defendant MTC's contracts with Otero County and/or NMCD.

B.      failing to exercise the statutory duties of a corrections officer with respect to enforcing the laws of New Mexico and arresting those who violate those laws while on the premises of OCPF;

C.      failing to meet the statutory qualifications for being a correctional officer.

387.    The violation of these statutes by Defendants MTC, Martinez, and John Does 1-5 constitutes negligence as a matter of law.

388.    Each of the MTC Defendants' negligence as a matter of law as described above was a direct and proximate cause of injuries and resulting damages claimed by Mr. Bradshaw in this action.

389.    The acts and omissions of Defendants MTC, Martinez, and John Does 1-5 described above were intentional, malicious, sadistic, willful, wanton, obdurate and in gross and reckless disregard of their statutory duties as described above.

390.    The law provides for Mr. Bradshaw to receive an award of compensatory and punitive damages from Defendant MTC for each of the MTC Defendants' negligence as a matter of law at OCPF, including those articulated in his prayer for relief below, as well as costs and interest as provided by law.

### COUNT III: MR. BRADSHAW'S STATE LAW CLAIMS AGAINST DEFENDANTS OTERO COUNTY, SHERIFF BLACK, AND JOHN DOES 6-10.

391.    Mr. Bradshaw realleges and incorporates all the preceding paragraphs of this Complaint as if fully stated herein.

392.    No violation of federal law is presently alleged against Defendants Otero County, Sheriff Black, or John Does 6-10 in this Complaint.

393.    Defendants Otero County, Sheriff Black, and John Does 6-10 are collectively referenced in this count as "the Otero County Defendants."

### A.    Negligent Operation of Buildings, Machinery, Equipment, and Furnishings

394.    The immunity provided by the NMTCA does not apply or is waived with respect to the Otero County Defendants' negligent operation and maintenance of buildings, machinery, equipment, and furnishings at county-owned facilities.

395.   In undertaking to house, transport, warn, communicate with, and protect Mr. Bradshaw from harm during his incarceration at county-owned facilities, and to contract for the provision of those services, the Otero County Defendants were under a duty to perform in accordance with a reasonably prudent person's standard of care in their operation and maintenance of the buildings, machinery, equipment, and furnishings at county-owned facilities. Pursuant to Section 41-4-2(B) of the NMTCA, that duty and standard of care are defined according to traditional tort concepts under New Mexico common law applicable to these Defendants.

396.   The Otero County Defendants breached their duties as described above and failed to perform in accordance with a reasonably prudent person's standard of care in the context of operating and maintaining buildings, machinery, equipment, and furnishings to house, transport, warn, communicate with, and protect Mr. Bradshaw from harm, and to contract for the provision of those services, during his incarceration at county-owned facilities.

397.   The Otero County Defendants' negligent operation and maintenance of buildings, machinery, equipment, and furnishings at county-owned facilities included, but is not limited to:

A.   Housing Mr. Bradshaw in a county-owned facility where he was left unmonitored, unduly exposed to extortion and violent attack, and without adequate care for his serious medical needs for significant periods of time, and where he was physically barred from safe avenues of retreat and access to reasonably prudent staff qualified to screen, diagnose, treat, warn, communicate with, protect and care for inmates presenting with his conditions of confinement, symptoms, and medical history.

B.   Failure to properly operate and maintain the machinery, equipment, and furnishings at county-owned facilities reasonably necessary to screen, diagnose, treat, warn, communicate with, protect and care for Mr. Bradshaw and his serious medical needs.

C.      Failure to properly operate and maintain the machinery, equipment, and furnishings at county-owned facilities reasonably necessary to accurately and completely record and communicate threats and conditions of confinement which jeopardized Mr. Bradshaw's personal safety, as well as Mr. Bradshaw's symptoms, reported medical history, or the known or reasonably foreseeable risks described above to qualified members of the Otero County Defendants' staff, leadership, or off-site medical personnel in a timely manner.

D.      Failure to properly operate and maintain the buildings, machinery, equipment, and furnishings at county-owned facilities reasonably necessary to arrange for timely transfer of Mr. Bradshaw to another facility or housing unit where he would not be subject to extortion and violent attack.

E.      Failure to properly operate and maintain the buildings, machinery, equipment, and furnishings at county-owned facilities reasonably necessary to arrange for timely transfer of Mr. Bradshaw to a hospital or other appropriate off-site health care facility, or to another correctional facility or housing unit capable of protecting him from violent attack and extortion by other inmates, and imposing physical barriers which effectively prevented him from summoning such transfers, medical care, records, or communications on his own initiative.

398.    The Otero County Defendants' negligent operation and maintenance of buildings, machinery, equipment, and furnishings at facilities owned by the County as described above was a direct and proximate cause of the injuries and resulting damages claimed by Mr. Bradshaw in this action.

399.    The law provides for Mr. Bradshaw to receive an award of compensatory damages from Defendant Otero County for each of the Otero County Defendants' negligent operation and maintenance of buildings, machinery, equipment, and furnishings at facilities owned by the

County, including those articulated in his prayer for relief below, as well as costs as interest as provided by law.

**B.      Negligent Operation of Infirmaries, Health Care Clinics, or Like Facilities**

400.     The immunity provided by the NMTCA does not apply or is waived with respect to the Otero County Defendants' negligent operation of the medical unit, infirmary, clinic, or like facilities they owned.

401.     In undertaking to screen, diagnose, treat, warn, and care for Mr. Bradshaw's serious medical needs during his incarceration in county-owned facilities, or to contract for the provision of those services, the Otero County Defendants were under a duty to perform in accordance with a reasonably prudent person's standard of care in their operation of the medical unit, infirmary, clinic, or like facilities they owned. Pursuant to Section 41-4-2(B) of the NMTCA, that duty and standard of care are defined according to traditional tort concepts under New Mexico common law applicable to these Defendants.

402.     The Otero County Defendants breached their duties as described above and failed to perform in accordance with a reasonably prudent person's standard of care in responding to Mr. Bradshaw's serious medical needs in the context of their operation of the medical unit, infirmary, clinic, or like facilities they owned.

403.     The negligent operation of the medical unit, infirmary, clinic, or like facilities owned by the Otero County Defendants included, but is not limited to:

A.      Failing to hire, train, supervise, and retain reasonably prudent staff and contractors at county-owned facilities to care for inmates such as Mr. Bradshaw, when it was known or reasonably foreseeable that such failure would place inmates such as Mr. Bradshaw at unreasonable risk of infection and disease, serious personal injury, and unnecessary pain, suffering, and expense.

B.      Failure to recognize, create, and implement reasonably prudent policies, procedures, protocols, and plans for diagnosis, treatment, warning, and communication of Mr. Bradshaw's serious medical needs.

C.      Allowing Mr. Bradshaw's serious medical needs to go unmonitored and unattended by qualified medical staff for significant periods of time while in state custody at county-owned facilities despite the known or reasonably foreseeable risks described above.

D.      Failing to accurately or completely communicate Mr. Bradshaw's symptoms, reported medical history, medications, or the known or reasonably foreseeable risks associated with them, to qualified members of Otero County's staff or leadership, or to off-site specialists or health care providers, in a timely manner.

E.      Failure to timely prepare for, call for, or arrange transfer to an appropriate hospital or other off-site health care facility capable of properly diagnosing and treating Mr. Bradshaw's serious medical needs.

404.    The negligent operation of the medical unit, infirmary, clinic or like facilities owned by the Otero County Defendants as described above was a direct and proximate cause of injuries and resulting damages claimed by Mr. Bradshaw in this action.

405.    The law provides for Mr. Bradshaw to receive an award of compensatory damages from Defendant Otero County for each of the Otero County Defendants' negligent operation of the medical unit, infirmary, clinic, or like facilities owned by the County, including those articulated in his prayer for relief below, as well as costs and interest as provided by law.

**C.      Neglect and Dereliction of Statutory Duties
        by Defendants Black and John Does 6-10.**

406.     The immunity provided by the NMTCA does not apply or is waived with respect to a law enforcement officer's failure to comply with New Mexico statutes or laws, and with respect to a law enforcement officer's negligence which causes a battery.

407.     Defendants Sheriff Black, John Does 6-10 and other Otero County Sheriff's Deputies under their direct supervision and control fall under the statutory definition of "law enforcement officers" provided in Section 41-4-12 of the NMTCA, as amended

408.     Mr. Padilla's violent attack on Mr. Bradshaw on or about March 1, 2020, as described above, constitutes a "battery" within the meaning of Section 41-4-12 of the NMTCA, as amended.

409.     Defendants Black, John Does 6-10, and other Otero County sheriff's deputies under their direct supervision and control had a common-law duty to exercise the care of reasonably prudent and qualified officers in activities undertaken for the safety of others, including Mr. Bradshaw. This duty required Defendant Black, John Does 6-10, and other Otero County Sheriff's deputies under their direct supervision and control to keep a proper lookout for and investigate criminal activity in Otero County which placed others in danger so as to prevent harm to them.

410.     Defendants Black, John Does 6-10, and other Otero County Sheriff's Deputies under their direct supervision and control breached their common-law duties as described above with respect to Mr. Bradshaw by failing to exercise the care of reasonably prudent and qualified officers in activities undertaken for the safety of others, including Mr. Bradshaw.

411.     Defendants Black, John Does 6-10, and other Otero County Sheriff's Deputies under their direct supervision and control were under a statutory duty to comply with New Mexico statutes and law, including NMSA 1978, Sections 4-37-4, 4-41-2, and 29-1-1, and to formulate and implement procedures to prevent the breach of these statutory duties.

412.     Defendants Black, John Does 6-10, and other Otero County Sheriff's Deputies under their direct supervision and control breached their duties under New Mexico statutes and law as described above and failed to comply with those statutes and law in the following respects:

A.       failure to enforce the provisions of all county ordinances, diligently file a complaint or information alleging a violation if circumstances would indicate that action to a reasonably prudent person; and cooperate with the district attorney or other prosecutor in all reasonable ways as required under NMSA 1978, § 4-37-4(A).

B.       failure to be the conservator of the peace within their county, suppress assaults and batteries, and apprehend and commit to jail, all felons and traitors, and cause all offenders to keep the peace and to appear at the next term of the court and answer such charges as may be proffered against them as required under NMSA 1978, § 41-4-2.

C.       failure to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware, and failure to diligently file a complaint or information, if the circumstances are such as to indicate to a reasonably prudent person that such action should be taken, and failure to cooperate with and assist the attorney general, district attorney or other prosecutor if any, in all reasonable ways as required under NMSA 1978, Section 29-1-1.

D.       Failure to formulate and implement procedures to prevent the breach of these statutory duties at county-owned facilities.

413.     The failure of Defendants Black, John Does 6-10, and other Otero County sheriff's deputies under their direct supervision and control to comply with their duties under New Mexico statutes and common law as described above was a direct and proximate cause of the battery inflicted upon Mr. Bradshaw and the resulting injuries and damages claimed by Mr. Bradshaw in this action.

414. The law provides for Mr. Bradshaw to receive an award of compensatory damages from Defendant Otero County for the failure of Defendants Black and John Does 6-10 to comply with New Mexico statutes and common law described in this Count, including those articulated in his prayer for relief below, as well as costs and interest as provided by law.

## COUNT IV: MR. BRADSHAW'S STATE LAW CLAIMS
## AGAINST DEFENDANTS NEW MEXICO CORRECTIONS DEPARTMENT,
## SECRETARY LUCERO, AND JOHN DOES 11-15.

415. Mr. Bradshaw realleges and incorporates all the preceding paragraphs of this Complaint as if fully stated herein.

416. No violation of federal law is presently alleged against Defendants NMCD, Lucero, or John Does 11-15 in this Complaint.

417. Defendants NMCD, Lucero, and John Does 11-15 are collectively referenced in this count as "the NMCD Defendants."

**A.     Negligent Operation of Infirmaries, Health Care Clinics, or Like Facilities**

418. The immunity provided by the NMTCA does not apply or is waived with respect to the NMCD Defendants' negligent operation of NMCD's medical unit, infirmary, clinic, or like facilities.

419. In undertaking to screen, diagnose, treat, warn, and care for Mr. Bradshaw's serious medical needs during his incarceration in NMCD facilities, the NMCD Defendants were under a duty to perform in accordance with a reasonably prudent person's standard of care in their operation of NMCD's medical unit, infirmary, clinic, or like facilities. Pursuant to Section 41-4-2(B) of the NMTCA, that duty and standard of care are defined according to traditional tort concepts under New Mexico common law applicable to these Defendants.

420. The NMCD Defendants breached their duties as described above and failed to perform in accordance with a reasonably prudent person's standard of care in responding to Mr.

Bradshaw's serious medical needs in the context of their operation of NMCD's medical unit, infirmary, clinic, or like facilities.

421.    The negligent operation of NMCD's medical unit, infirmary, clinic, or like facilities by the NMCD Defendants includes, but is not limited to:

A.    Failing to hire, train, supervise, and retain reasonably prudent staff and contractors at NMCD facilities to care for inmates such as Mr. Bradshaw, when it was known or reasonably foreseeable that such failure would place inmates such as Mr. Bradshaw at unreasonable risk of infection and disease, serious personal injury, and unnecessary pain, suffering, and expense.

B.    Failure to recognize, create, and implement reasonably prudent policies, procedures, protocols, and plans for diagnosis, treatment, warning, and communication of Mr. Bradshaw's serious medical needs.

C.    Allowing Mr. Bradshaw's serious medical needs to go unmonitored and unattended by qualified medical staff for significant periods of time while in state custody at NMCD facilities despite the known or reasonably foreseeable risks described above.

D.    Failing to accurately or completely communicate Mr. Bradshaw's symptoms, reported medical history, medications, or the known or reasonably foreseeable risks associated with them, to qualified members of NMCD's staff or leadership, or to off-site specialists or health care providers, in a timely manner.

E.    Failure to timely prepare for, call for, or arrange transfer to an appropriate hospital or other off-site health care facility capable of properly diagnosing and treating Mr. Bradshaw's serious medical needs.

422.     The negligent operation of NMCD's medical unit, infirmary, clinic or like facilities by the NMCD Defendants as described above was a direct and proximate cause of injuries and resulting damages claimed by Mr. Bradshaw in this action.

423.     The law provides for Mr. Bradshaw to receive an award of compensatory damages from Defendant NMCD for each of the NMCD Defendants' negligent operation of NMCD's medical unit, infirmary, clinic, or like facilities described herein, including those articulated in his prayer for relief below, as well as costs and interest as provided by law.

### B.     Negligent Operation of Buildings, Machinery, Equipment, and Furnishings

424.     The immunity provided by the NMTCA does not apply or is waived with respect to the NMCD Defendants' negligent operation and maintenance of buildings, machinery, equipment, and furnishings at NMCD facilities.

425.     In undertaking to house, transport, warn, communicate with, and protect Mr. Bradshaw from harm during his incarceration at NMCD facilities, the NMCD Defendants were under a duty to perform in accordance with a reasonably prudent person's standard of care in their operation of the buildings, machinery, equipment, and furnishings at NMCD facilities. Pursuant to Section 41-4-2(B) of the NMTCA, that duty and standard of care are defined according to traditional tort concepts under New Mexico common law applicable to these Defendants.

426.     The NMCD Defendants breached their duties as described above and failed to perform in accordance with a reasonably prudent person's standard of care in the context of operating and maintaining buildings, machinery, equipment, and furnishings to house, transport, warn, communicate with, and protect Mr. Bradshaw from harm during his incarceration at NMCD facilities.

427.     Defendants' negligent operation and maintenance of buildings, machinery, equipment, and furnishings at NMCD facilities included, but is not limited to:

A.    Housing Mr. Bradshaw in and transporting him to a facility where he was left unmonitored, unduly exposed to extortion and violent attack, and without adequate care for his serious medical needs for significant periods of time, and where was physically barred from safe avenues of retreat and access to reasonably prudent staff qualified to screen, diagnose, treat, warn, communicate with, protect and care for inmates presenting with his conditions of confinement, symptoms, and medical history.

B.    Failure to properly operate and maintain the machinery, equipment, and furnishings reasonably necessary to screen, diagnose, treat, warn, communicate with, protect and care for Mr. Bradshaw and his serious medical needs.

C.    Failure to properly operate and maintain the machinery, equipment, and furnishings reasonably necessary to accurately and completely record and communicate threats and conditions of confinement which jeopardized Mr. Bradshaw's personal safety, as well as Mr. Bradshaw's symptoms, reported medical history, or the known or reasonably foreseeable risks described above to qualified members of the NMCD Defendants' staff, leadership, or off-site medical personnel in a timely manner.

D.    Failure to properly operate and maintain the buildings, machinery, equipment, and furnishings reasonably necessary to arrange for timely transfer of Mr. Bradshaw to a facility or housing unit where he would not be subject to extortion and violent attack.

E.    Failure to properly operate and maintain the buildings, machinery, equipment, and furnishings reasonably necessary to arrange for timely transport of Mr. Bradshaw to a hospital or other appropriate off-site health care facility, and imposing physical barriers which effectively prevented him from summoning emergency medical transport, care, records, or communications on his own initiative.

428.     The NMCD Defendants' negligent operation and maintenance of buildings, machinery, equipment, and furnishings at NMCD facilities as described above was a direct and proximate cause of the injuries and resulting damages claimed by Mr. Bradshaw in this action.

429.     The law provides for Mr. Bradshaw to receive an award of compensatory damages from Defendant NMCD for each of the NMCD Defendants' negligent operation and maintenance of buildings, machinery, equipment, and furnishings at NMCD facilities described in this Count, including those articulated in his prayer for relief below, as well as costs as interest as provided by law.

### C.     Law Enforcement Officers' Violation of New Mexico Statutes and Laws

430.     The immunity provided by the NMTCA does not apply or is waived with respect to a law enforcement officer's failure to comply with New Mexico statutes or laws, and with respect to a law enforcement officer's negligence which causes a battery.

431.     The NMCD Defendants and other public employees of NMCD under their direct supervision and control fall under the statutory definition of "law enforcement officers" provided in Section 41-4-12 of the NMTCA, as amended.

432.     Mr. Padilla's violent attack on Mr. Bradshaw on or about March 1, 2020, as described above, constitutes a "battery" within the meaning of Section 41-4-12 of the NMTCA, as amended.

433.     In undertaking to house and provide health care to Mr. Bradshaw, and to protect him from harm, the NMCD Defendants were under a statutory duty to comply with New Mexico statutes and law, including the following:

A.     The Secretary of Corrections shall manage all operations of the department and administer and enforce the laws with which she or the department is charged, as required under NMSA 1978, Sections 9-3-5(A) and 9-3-5(B)(5).

B.      The Secretary of Corrections shall adopt rules and regulations necessary for administration of the Corrections Act, and enforce and administer those adopted, as required under NMSA 1978, Section 33-1-6(B).

C.      Correctional officers shall have the power of a peace officer with respect to arrests and enforcement of laws when on the premises of a New Mexico correctional facility, as required under NMSA 1978, Section 33-1-10.

D.      The Corrections Department has the power and the duty to examine and inquire into all matters connected with the government, discipline and police of the corrections facilities and the punishment and treatment of the prisoners and shall inspect the corrections facilities and listen to any complaints of oppression or misconduct on the part of the warden or any of the other employees under him, as required under NMSA 1978, Section 33-2-11.

434.    The NMCD Defendants breached their duties under New Mexico statutes and law as described above and failed to comply with those statutes and law in responding to threats to Mr. Bradshaw's personal safety, as well as his serious and continuing medical needs and injuries, while he was in state custody.

435.    The NMCD Defendants' failure to comply with New Mexico statutes and law at NMCD facilities included, but is not limited to:

A.      failure to manage all operations of the Department and to administer and enforce the laws which they and the Department are charged, in the manner required under NMSA 1978, §§ 9-3-5 and 33-1-6.

B.      failure to administer and enforce the rules, regulations, and policies requiring the provision of appropriate and uninterrupted health care to inmates with health conditions, as required under NMCD Policy No. CD-170000.

114

C.      failure to administer and enforce the rules, regulations, and policies requiring that all inmates are treated with dignity and respect and in a manner that recognizes their basic human rights, as required under NMCD Policy No. CD 176100.

D.      failure to exercise the power of a peace officer with respect to arrests and enforcement of laws when on the premises of a New Mexico correctional facility, as required under NMSA 1978, Section 33-1-10.

E.      failure to examine and inquire into all matters connected with the government, discipline and police of the corrections facilities and the punishment and treatment of the prisoners and to inspect the corrections facilities, as required under NMSA 1978, Section 33-2-11.

436.    The NMCD Defendants' failure to comply with their duties under New Mexico statutes and law as described above was a direct and proximate cause of injuries and resulting damages claimed by Mr. Bradshaw in this action.

437.    The law provides for Mr. Bradshaw to receive an award of compensatory damages from Defendant NMCD for each of the NMCD Defendants' failure to comply with New Mexico statutes and law described in this Count, including those articulated in his prayer for relief below, as well as costs and interest as provided by law.

## PRAYER FOR RELIEF

438.    Mr. Bradshaw realleges and incorporates all the preceding paragraphs of this Complaint as if fully stated herein.

439.    With respect to each of the above claims on which he prevails, Mr. Bradshaw requests damages in an amount sufficient to compensate him for all resulting injuries and harm, including, but not limited to the physical, psychological, permanent, and disabling injuries he

experienced; severe emotional distress, anguish, pain, and suffering; aggravating circumstances; and other incidental, consequential, and special damages as provided by law.

440.     Mr. Bradshaw requests an award of punitive damages with respect to those claims and Defendants for which such an award is lawfully available, including his federal civil rights claims against Defendants Martinez and John Does 1-5, as well as his state law claims against Defendants MTC, Martinez, and John Does 1-5.

441.     Mr. Bradshaw requests an award of reasonable attorney fees, expenses, and costs under 42 U.S.C. Section 1988 with respect to all federal civil rights claims in Count I on which he prevails.

442.     Mr. Bradshaw requests an award of the costs of this action, as well as interest as provided by law, with respect to each claim on which he prevails.

## JURY DEMAND

443.     Mr. Bradshaw requests a trial by jury on all issues so triable.

Respectfully Submitted,

**ROTHSTEIN DONATELLI LLP**

 */s/ Arne R. Leonard*
ARNE R. LEONARD
CAROLYN M. "CAMMIE" NICHOLS
500 4th Street, N.W., Suite 400
Albuquerque, New Mexico 87102
505-243-1443
Fax: 505-242-7845
cmnichols@rothsteinlaw.com
aleonard@rothsteinlaw.com

LINDA G. HEMPHILL
LEIGH MESSERER
The Hemphill Firm PC
P.O. Box 33136
Santa Fe, New Mexico 87594-3136
505-986-8515
Fax: 505-986-1132
linda@hemphillfirm.com
leigh@hemphillfirm.com

WILLIAM H. SNOWDEN
The Snowden Law Firm PC
3550 Trinity Dr #B-4
Los Alamos, New Mexico 87544-1775
505-695-6183
whsnowden@yahoo.com

*Attorneys for Plaintiff David Lee Bradshaw*